82 P.3d 1159 (2003)
2003 UT App 429
STATE of Utah, in the interest of M.C. and S.C. aka M.H., persons under eighteen years of age.
R.C., Appellant,
v.
State of Utah, Appellee.
No. 20021058-CA.
Court of Appeals of Utah.
December 11, 2003.
*1160 Justin Gary Jensen, Draper, for Appellant.
Mark L. Shurtleff, Atty. Gen., and John M. Peterson, Asst. Atty. Gen., Salt Lake City, for Appellee.
Martha Pierce, Salt Lake City, Guardian Ad Litem.
Before BILLINGS, Associate P.J., GREENWOOD, and ORME, JJ.

OPINION
ORME, Judge:
¶ 1 A father appeals the juvenile court's order terminating his parental rights to his daughters, M.C. and S.C. The father seeks reversal of the termination order, arguing, inter alia, that the juvenile court failed to find that DCFS made "reasonable efforts to provide [reunification] services" pursuant to Utah Code Ann. § 78-3a-407(3)(a) (2002). We hold that the father's arguments are without merit and affirm.

BACKGROUND
¶ 2 M.C. was born on April 10, 2000. Shortly thereafter, M.C.'s half-sister[1] was adjudicated a neglected child, and permanent custody of the half-sister was granted to these girls' maternal grandmother. The juvenile court retained jurisdiction over M.C. and her mother.[2]
¶ 3 When M.C. was three months old, her mother fled with her to Missouri to live with M.C.'s father, appellant R.C. (Father). The juvenile court issued a bench warrant for M.C.'s mother and a "pick-up" order for M.C. On April 8, 2001, S.C. was born. Two months later, the mother returned to Utah with S.C. and M.C. (the children) and turned herself in. The court found that the mother was in violation of a "no contact" order in reference to Father, which was issued due to "a history of [the two] having committed domestic violence in the presence of the children." The mother was subsequently incarcerated on the outstanding warrant, and temporary custody of the children was awarded to their maternal grandmother.
¶ 4 On November 1, 2001, the State filed a petition with the juvenile court, asking it to find that the children were neglected within the meaning of Utah Code Ann. § 78-3a-103(1)(s)(i)(C), (E) (2002).[3] At a dispositional hearing held the same day, the court found that despite "reasonable and persistent efforts" by the Division of Child and Family Services (DCFS) "to prevent out of home placement," allowing the children to continue to live in the home "would be contrary to the[ir] welfare." The children were placed in the custody of DCFS, and the court ordered that Father should have no contact with the children, their mother, or the children's maternal grandparents.
¶ 5 On November 27, 2001, the juvenile court held a pretrial hearing on the State's *1161 neglect petition. Because Father's appeal turns on the procedural history of this case, we review that history in detail.
¶ 6 The children's mother admitted the allegations contained in the petition, and the children were adjudicated neglected as to the mother. Father denied the neglect allegations in part, so the court ordered that adjudication on the petition as to Father would take place at a future date. The court also ordered, inter alia, the following:
1. Previous order of temporary custody and guardianship of said children with [DCFS] is hereby continued.
2. [Father] shall have no contact with the mother or the [children's maternal grandparents.]
3. The mother shall have unsupervised visitation with the children.
4. [Father] shall have supervised visitation [with the children] as deemed appropriate by DCFS, contingent upon clean urinalysis tests.
5. The Court hereby orders that an expedited ICPC[4] occur on the father's home in Missouri.
6. The State is to develop and provide a service plan within 15 days which will be adopted as part of today's order unless objected to by counsel within 5 days of receipt. Copies of the service plan are to be distributed to all counsel.
7. The Court directs that the State provide Reunification Services for the mother.
¶ 7 Adjudication on the neglect petition as to Father was scheduled for January 4, 2002. Father failed to attend the January 4 hearing, however, so the court entered a default judgment against him, finding the neglect allegations against Father "to be true and correct by clear and convincing evidence." The court also ordered, among other things, that "[t]emporary custody and guardianship of the children shall continue with [the children's maternal grandparents]," and that "DCFS shall prepare a service plan for father within 15 days from the date of this hearing."
¶ 8 DCFS implemented a service plan on January 15, 2002, which stated, among other things, that "in order for [Father] to be considered for reunification with his children he needs to be able to demonstrate that he is able to provide for his children's basic needs." Thus, the service plan required Father to "provide clean [urinalysis tests], ensure a stable income and demonstrate appropriate parenting skills for a period of at least three months."
¶ 9 On April 4, 2002, the juvenile court granted a trial home placement of the children with the mother. The court also ordered DCFS to "provide Family Preservation services to the family of said children" and ordered that "Peer Parenting" and "Protective Supervision Services" should be included in the service plan. The record indicates Father did not attend the April 4, 2002, hearing. At or around that time, however, Father, who had been living in Missouri, returned to Utah.
¶ 10 In a sworn affidavit, Ms. Mostert, a DCFS caseworker, testified that she "received several reports from the [children's] maternal grandparents that [the mother] was having contact with [Father] while she was exercising visitation with her children." Ms. Mostert further testified that, "[t]o ensure the safety of the children, I conducted a walk-through of [the mother's] home and specifically instructed her not to have contact with [Father] as that would be a violation of the Court's Order and would place the children at risk. [The mother] assured me that [Father] would not be present during visitation."
¶ 11 However, on April 23, 2002, during a telephone conversation between Ms. Mostert and the mother, Father "took the phone from [the mother] and reported to [Ms. Mostert] *1162 that he and [the mother] ha[d] been spending a lot of time together in violation of the no contact order." Father continued this unsolicited confession by admitting that he had been "hiding under the bed" at the time of Ms. Mostert's visit to the mother's home.
¶ 12 During the spring of 2002, numerous incidents of domestic violence occurred between the mother and Father, many of which required intervention by law enforcement. In her affidavit, Ms. Mostert testified regarding one such incident as follows:
On May 13, 2002, [the mother] contacted the Salt Lake City Police Department and reported that [Father] had violated a protective order and assaulted her.... When the police responded, [the mother] and [Father] reported that they had been living together for approximately one week. The police observed that [the mother] had a cut lip, an abrasion on her cheek, a scratch across her chest and her face was swollen. [Father] had scratches on his neck and arms.... [The mother] reported that ... she and [Father] got into an altercation in which [Father] jumped on her and grabbed her face, scratched her, spat in her face, pulled her hair out, punched her in the mouth and swung a baseball bat at her, grazing her cheek and lip.... [Father] denied [the mother's] accusations and reported that [the mother] had hit him with the baseball bat.... [Father] was arrested for assault and violation of a protective order.
¶ 13 A review hearing was held on June 4, 2002, at which time the court reviewed a report from Ms. Mostert. At the hearing, the State "expressed concerns" and "moved the Court to terminate reunification services." The guardian ad litem also "expressed concerns" and "concurred with the [State's] recommendation to terminate reunification services." The State then submitted a "Verified Petition for Termination of Parental Rights." After accepting comments from all parties present at the hearing, including Father, the court "terminate[d] reunification services as to both parents, ... suspend[ed] all visitation temporarily between the Parents and the Children," and ordered that "the Parents are to have NO CONTACT or communication [with the children], incidental or otherwise, unless in a therapeutic setting."
¶ 14 The parties were again in court on June 21, 2002, in response to the State's order to show cause for Father's violation of the court's protective order and for a pretrial hearing on the State's petition to terminate parental rights. Father admitted violating the "no contact" provisions of the protective order and was found in contempt of court. The guardian ad litem also advised the court that, although visitation with his children was contingent upon the successful completion of at least two consecutive negative urinalysis tests, Father "ha[d] yet to submit a clean drug screen." The court continued its previous order of "No Contact, incidental or otherwise, by and between the Father and said children" and set a trial date on the State's petition to terminate parental rights.
¶ 15 The termination petition was tried before the juvenile court on October 28-29, 2002. Father was present and represented by counsel. All parties were given an opportunity to present evidence and be heard, and the court took the matter under advisement. On November 27, 2002, the court entered an order permanently terminating the parental rights of both parents.[5] Father timely appealed the termination order to this court.

*1163 ISSUES AND STANDARDS OF REVIEW
¶ 16 Father seeks reversal of the juvenile court's termination order, arguing, first, that the court failed to find that DCFS "made reasonable efforts to provide [reunification] services" pursuant to Utah Code Ann. § 78-3a-407(3)(a) (2002), and second, that the court failed to conduct a permanency hearing in violation of Father's due process rights. Both issues involve "[a]pplication of statutory law to the facts" and thus "present[ ] mixed question[s] of fact and law." In re G.B., 2002 UT App 270, ¶ 11, 53 P.3d 963. See generally State v. Pena, 869 P.2d 932 (Utah 1994). Thus, "[w]e review the juvenile court's [factual] findings for clear error and its conclusions of law for correctness, affording the court `some discretion in applying the law to the facts.'" In re G.B., 2002 UT App 270 at ¶ 11, 53 P.3d 963 (quoting In re C.B., 1999 UT App 293, ¶ 5, 989 P.2d 76). Father's due process claim is reviewed for correctness. See In re K.M., 965 P.2d 576, 578 (Utah Ct.App.1998).

ANALYSIS

I. Reunification Services
¶ 17 Utah Code Ann. § 78-3a-407(3)(a) (2002) provides: "In any case in which the court has directed the division to provide reunification services to a parent, the court must find that the division made reasonable efforts to provide those services before the court may terminate the parent's rights[.]" Father argues that the juvenile court failed to make the finding required by subsection (3)(a).
¶ 18 We begin our analysis by noting that it is unclear whether subsection (3)(a) even applies to the facts of this appeal. While reunification services were unequivocally ordered for the mother, the record is ambiguous as to whether such services were also ordered for Father. At the November 27, 2001, hearing on the State's neglect petition, the court ordered "that the State provide Reunification Services for the mother," but made no such order as to Father.[6] And although at the same hearing the court ordered the State "to develop and provide a service plan within 15 days," the court's subsequent written order indicates this service plan was intended to apply only to the mother.[7] At the hearing on June 4, 2002, the court did refer to "terminat[ing] reunification services as to both parents," but the service plan prepared by DCFS for Father following the January 4, 2002, hearing indicated that Father would not receive reunification services until, among other things, he provided clean urinalysis tests.
¶ 19 The apparent exclusion of Father from some of the court's orders at the November 27, 2001, hearing may well be explained by the fact that adjudication on the neglect petition as to Father did not take place until January 4, 2002. At the January 4, 2002, hearing, the court ordered that "DCFS shall prepare a service plan for [F]ather within 15 days from the date of this hearing." This service plan, dated January 15, 2002, and entitled "Protective Services Supervision Family Service Plan," contains goals and objectives for both parents. In regard to the mother, the stated goal of the service plan is that "[the mother] will have and maintain a working relationship with DCFS to work towards reunification with her children." The service plan then identified the various changes the mother must make in her behavior and lifestyle before reunification could be accomplished.
¶ 20 In regard to Father, the plan recognizes, with our emphasis, that "[Father] has expressed interest in being considered for reunification with his daughters, [M.C.] and [S.C.]." The plan then states that, "[d]ue to present concerns[,] in order for [Father] to be considered for reunification with his children *1164 he needs to be able to demonstrate that he is able to provide for his children's basic needs." According to the plan, such a demonstration includes the following:
[Father] needs to be able to provide clean [urinalysis tests], ensure a stable income and demonstrate appropriate parenting skills for a period of at least three months before DCFS will initiate the ICPC process.... [Father] is responsible for contacting DCFS with his progress and providing all of the necessary documentation to DCFS in order to demonstrate that he is making progress on this objective.... In turn, DCFS will be responsible for filing the information received from [Father] and providing an accurate account of the progress of [Father] to the court.
¶ 21 The above language indicates that reunification services were not among the services initially extended to Father. Rather, the plan appears to contemplate that Father must demonstrate his commitment by taking the steps detailed above before he would be considered for actual reunification services.
¶ 22 The court's written findings in connection with the termination order cast further doubt on whether reunification services, per se, were ever ordered for Father. The court's order catalogues in detail the various reunification services provided for the mother, and in an equally thorough manner explains the ways in which "the mother failed to comply with a reunification service plan designed to unite her with her children." The court's careful attention to the "reasonable efforts" finding required by section 78-3a-407(3)(a) in regard to the mother further suggests that subsection (3)(a) did not apply to Father because actual reunification services had not been ordered for him. The unlikely alternative is that the court keenly focused on subsection (3)(a) as concerns the mother, but inexplicably neglected to deal with Father's status under that subsection.
¶ 23 Notwithstanding the analysis above, we acknowledge the possibility that reunification services should be deemed to have been extended to Father. It is possible, for example, that by ordering a "service plan" for Father at the January 4, 2002, hearing, the court intended reunification services to be part of that plan, or that by ordering "Family Preservation services" at the April 4, 2002, hearing, the court intended to include Father as a recipient of such services.[8] We note that neither the State nor the guardian ad litem categorically deny on appeal that such services were ordered for Father as well as the mother. Out of an abundance of caution, therefore, we address the merits of Father's argument regarding the sufficiency of findings under subsection (3)(a). As discussed below, however, even if reunification services were ordered for Father, it does not change the result, because the juvenile court's findings in regard to Father sufficiently comply with the "reasonable efforts" requirement of section 78-3a-407(3)(a).
¶ 24 The court's findings in regard to Father include the following:
[Father] has failed to involve himself in any efforts to reunite with his children, or to rectify the turbulent and tumultuous conduct or behavior in which he has engaged.[9]... [Father] has a known history of drug abuse, and has had several positive urinalysis tests for marihuana, but he has failed to successfully complete any drug treatment.... [Father] maintains a home in Missouri, and testified he considers it as his home; indeed, he often would be gone from Utah for months at a time, and not see his children for extended periods of *1165 time; he never remained in one place long enough to establish a nurturing relationship with his children ... and he made little, or no effort[ ] to remain available and accessible to participate in any service plan(s); from November of 2001 to May of 2002, [Father] had no contact with, and made no inquiries regarding the children.... [He] has not provided any monetary support for the children, and has failed to make himself physically and emotionally available for them; for several months, the caseworker was unable to make any contact with him; from December of 2001 until April of 2002, he made only one (1) contact with the [DCFS] caseworker regarding his children.[10]
¶ 25 The court's findings make clear that Father was unresponsive to all efforts DCFS made to provide him services. For example, despite DCFS's efforts to provide Father with supervised visitation with his children contingent upon clean urinalysis tests, Father was unable or unwilling to comply with even that limited portion of the service plan. The record reveals that Father submitted to at least three urinalysis tests between November 2001 and October 2002. All of Father's urinalysis tests returned a positive result for marijuana use except the October 2002 test, which was taken six days before trial began on the State's petition to terminate Father's parental rights and well after the court had terminated reunification services.
¶ 26 The court's findings also emphasize the evident nonchalance with which Father viewed his parental obligations and responsibilitieseven when faced with the potential loss of his parental rights. Despite the service plan's clear statement that "[Father] is responsible for contacting DCFS with his progress and providing all of the necessary documentation to DCFS in order to demonstrate that he is making progress on this objective," Father remained out of state, provided none of the required information to DCFS, and generally made it difficult or impossible for DCFS to contact him.
¶ 27 In reality, Father's role in the juvenile court proceedings that culminated in the termination of his parental rights was passive and disinterested at best, and obstinate at worst. In this case, where Father has consistently violated court orders and done little or nothing to comply with even the limited provisions of the initial service plan, the court's findings are more than adequate to establish that DCFS made "reasonable efforts," under the circumstances, to provide reunification services to Father.[11] Utah Code Ann. § 78-3a-407(3)(a) (2002).

II. Permanency Hearing
¶ 28 Father next argues that the juvenile court erred by not holding a permanency hearing. Father failed to preserve this issue before the juvenile court but nevertheless urges us to address his argument under the "plain error" doctrine.

*1166 [T]o establish the existence of plain error and to obtain appellate relief from an alleged error that was not properly objected to, [Father] must show the following: (i) An error exists; (ii) the error should have been obvious to the [juvenile] court; and (iii) the error is harmful, i.e., absent the error, there is a reasonable likelihood of a more favorable outcome for [Father.][12]
State v. Dunn, 850 P.2d 1201, 1208 (Utah 1993).
¶ 29 Utah Code Ann. § 78-3a-311(2)(b)(iii) (2002) states: "If, at anytime, the court determines that reunification is no longer a child's primary permanency goal, the court shall conduct a permanency hearing in accordance with Section 78-3a-312 within the earlier of 30 days of the court's determination or 12 months from the original removal of the child." Relying on this language, Father argues that he was entitled to a permanency hearing no later than July 4, 2002, which was thirty days after the court terminated reunification services. Of course, section 78-3a-311(2)(b)(iii) applies only if reunification services were ordered for Father, which, as we have discussed, is far from clear. For purposes of resolving Father's "plain error" argument, however, we assume that reunification services were ordered for him. Thus, under section 78-3a-311(2)(b)(iii), Father was entitled to a permanency hearing within thirty days of June 4, 2002, the date reunification services were terminated, and, indeed, the record indicates the court did not hold a permanency hearing within that time frame. We readily conclude, however, that Father has not established plain error because he has not shown that he was prejudiced by the juvenile court's error. See Dunn, 850 P.2d at 1209 ("If any one of the [three] requirements is not met, plain error is not established.").
¶ 30 Father argues that he was deprived of due process because he was not "on notice that issues involving the permanency of the Children would be considered" at the proceedings leading up to and including the trial terminating his parental rights. Father further asserts that, "[h]ad [he] been afforded the opportunity to prepare a case and present evidence and argument on the issue of the permanency of the Children, the outcome of the case could have varied substantially" because "[Father] would have presented evidence and argued that DCFS had not provided reasonable reunification services at that point in the case." Father's position is untenable.
¶ 31 Because of the history of domestic violence in the home, the juvenile court ordered Father to have no contact with the children or their mother after the children's removal. However, the court granted supervised visitation privileges to Father on the condition that he provide clean drug screens according to the service plan. The service plan was to be expanded once Father had demonstrated his commitment to the initial portions of that plan. Because Father did not produce even one clean drug screen during the time reunification services were available, however, the no contact order between Father and his children remained in place the entire time, and actual reunification services were never extended. Under the circumstances, Father could not have successfully argued that DCFS failed to make "reasonable efforts" to provide services to him. Thus, Father has not shownas it is his burden to dothat had the court held a permanency hearing, it would have made a different decision regarding the termination of Father's parental rights. See State v. Vargas, 2001 UT 5, ¶ 39, 20 P.3d 271 ("[Appellant] has the burden of showing ... [that] `absent the error, there is a reasonable likelihood of a more favorable outcome for the appellant.'") (quoting Dunn, 850 P.2d at 1208-09); State v. Litherland, 2000 UT 76, ¶ 8, 12 P.3d 92 ("[Appellant] bears the burden *1167 of establishing that the trial court committed plain error.").

CONCLUSION
¶ 32 It is unclear that reunification services, per se, were ever contemplated for Father. Even if they were, the court's findings are more than adequate to show that DCFS made "reasonable efforts," under the circumstances, to provide such services to Father in accordance with section 78-3a-407(3)(a). Furthermore, Father has failed to establish that he was prejudiced by the court's failure to hold a permanency hearing. We therefore affirm the juvenile court's order terminating Father's parental rights to M.C. and S.C.
¶ 33 WE CONCUR: JUDITH M. BILLINGS, Associate Presiding Judge, PAMELA T. GREENWOOD, Judge.
NOTES
[1] Appellant R.C. is not the father of M.C.'s half-sister, and her status is not at issue in this appeal.
[2] The mother of the children voluntarily dismissed her appeal from the juvenile court's termination order.
[3] Under those provisions, a "`[n]eglected child' means a minor: ... (C) who lacks proper parental care by reason of the fault or habits of the parent, guardian, or custodian; ... [and/or] (E) who is at risk of being a neglected or abused child as defined in this chapter because another minor in the same home is a neglected or abused child as defined in this chapter." Utah Code Ann. § 78-3a-103(1)(s)(i)(C), (E) (2002).
[4] The acronym "ICPC" refers to the Interstate Compact on the Placement of Children. A study conducted pursuant thereto is focused on ensuring that "[e]ach child requiring placement shall receive the maximum opportunity to be placed in a suitable environment and with persons or institutions having appropriate qualifications and facilities to provide necessary and desirable care." Utah Code Ann. § 62A-4a-701 art. I(1) (2000). Under the ICPC, "[t]he proper authorities of the state from which the placement is made may obtain the most complete information on the basis of which to evaluate a projected placement before it is made." Id. § 62A-4a-701 art. I(4).
[5] The court found that, "[b]ased on evaluations of the children by professionals over a two (2) year period of time, [along with] the day to day observations by [the] foster parents," "the children were suffering from, and exhibiting, significant emotional behavior and trauma," which was "attributed to being victims of, and exposure to, domestic violence and neglect in their home environment." For example, M.C. was found to "exhibit[ ] an extraordinary amount of aggression for a child her age, by hitting and telling a play-doll (in therapeutic setting) to `shut up.'" In addition, M.C. "had sleep difficulties (awakening up to six (6) times during the night); temper tantrums; self-abuse by hitting herself; ... speech and verbal communication delay; [and] extreme fear at the presence of men." As to S.C., "she would abnormally arch her back, and cry, which was an indication of fear of, or unusual sensitivity to noises; sleep difficulty, and sensitivity to confusion, which [was attributed to] exposure to loud noises, uncommon to a child." The court found that, "[s]ince their removal from their parents' home and placement in foster care, their emotional and psychological status has improved significantly," and that "it is imperative that their current placement not be disturbed."
[6] The court did order that an ICPC study be done on Father, see supra note 4, and also ordered that "[F]ather ... shall have supervised visitation as deemed appropriate by DCFS, contingent upon clean urinalysis tests."
[7] The written order states: "The provisions of th[e] service plan are court ordered subject to any objection from defense counsel within five days thereafter from the date the service plan is received by the mother." (Emphasis added.)
[8] We reiterate, however, that Father, who presumably still lived in Missouri at the time, did not attend the April 4, 2002 hearing, at which time the mother was given a trial home placement with the children.
[9] On this point, the court detailed the "numerous incidents of domestic violence between the parents... [which often] required intervention by law enforcement," and involved, inter alia, "use of [weapons,] ... scratching and hitting each other, ... pulling out hair[,] ... belittling and berating each other with profanity, and[ ] several threats to kill each other." The court noted that "[o]ften, these violent episodes were played out in front of ... the children," and found that "[n]either parent has addressed domestic violence in counseling to reduce or resolve the abuse of each other[, but instead] have maintained their relationship in open and obvious contempt for the Court's order to sever it."
[10] These are not the only findings addressing the reasonableness of DCFS's efforts to provide services to Father. The State's petition to terminate Father's parental rights alleged that "the agency has made a diligent effort to provide appropriate services to the parents and they have substantially neglected, willfully refused, or been unable or unwilling to remedy the circumstances that caused the children to be in an out-of-home placement," and that DCFS made "reasonable efforts ... to return said children" to the parents. The court found that "the State has established [the petition] by clear and convincing evidence."
[11] Father makes much of his claim that DCFS failed to conduct an expedited ICPC as ordered by the court following the November 27, 2001 hearing. However, although the evidence presented at trial was somewhat conflicting on this issue, Ms. Mostert testified that she did instigate an ICPC study, and the fact that the ICPC report may have listed the paternal grandmother's address is of little consequence, since Father was living with his mother at the time.

In addition, even if DCFS made initiation of the ICPC procedure contingent upon Father's "provid[ing] clean [urinalysis tests], ensur[ing] a stable income and demonstrat[ing] appropriate parenting skills for a period of at least three months," as indicated in the service plan, it does not necessarily follow that DCFS's efforts were unreasonable in this respect. It is axiomatic that an ICPC study could not be accomplished without at least some cooperation from Father, and, in this instance, the record supports the juvenile court's conclusion that Father provided little or no cooperation to DCFS.
[12] Regarding the prejudice prong of the "plain error" test, the Utah Supreme Court has stated that "with respect to certain federal constitutional errors, ... the State [bears] the burden of proving that the error was harmless beyond a reasonable doubt." State v. Verde, 770 P.2d 116, 121 n. 8 (Utah 1989). Although Father alleges that failure to hold a permanency hearing violated his due process rights, he cites only the "plain error" test as enunciated in State v. Dunn, 850 P.2d 1201, 1208 (Utah 1993), and does not otherwise argue that the reasonable doubt standard applies to his due process argument. Therefore, consistent with Father's position as set forth in his brief, we apply the usual plain error test as set forth in Dunn. See id.