2020 UT App 26

# THE UTAH COURT OF APPEALS

STATE OF UTAH, IN THE INTEREST OF N.K.,
A PERSON UNDER EIGHTEEN YEARS OF AGE.

T.K.,
Appellant,
*v.*
STATE OF UTAH,
Appellee.

Opinion
No. 20190413-CA
Filed February 21, 2020

First District Juvenile Court, Logan Department
The Honorable Angela Fonnesbeck
No. 1152307

Michael C. McGinnis, Attorney for Appellant

Sean D. Reyes, Carol L.C. Verdoia, and John M.
Peterson, Attorneys for Appellee

Martha Pierce, Guardian ad Litem

JUDGE KATE APPLEBY authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and DIANA HAGEN
concurred.

APPLEBY, Judge:

¶1 The juvenile court terminated T.K.'s (Father) parental rights to N.K. (Child) after it found Father (1) neglected Child; (2) was an unfit or incompetent parent; (3) substantially neglected, willfully refused, or was unwilling to remedy the circumstances that caused Child to be placed in foster care; (4) experienced a failure of parental adjustment; and (5) made only token efforts to support or communicate with Child, to prevent neglect of Child, to eliminate the risk of serious harm to

Child, and to avoid being an unfit parent. The court also found that the Division of Child and Family Services (DCFS) made reasonable efforts to provide reunification services for Father and Child and concluded that termination of Father's parental rights was strictly necessary for Child's best interests. Father contends insufficient evidence supports the court's determination that he was incompetent or unfit and that he neglected Child, alleges the court erred when it found DCFS made reasonable efforts for reunification, and claims it was not strictly necessary to Child's best interests to terminate his parental rights. We affirm.

BACKGROUND

¶2 In November 2017, E.K. (Mother) was arrested during a traffic stop. Two-year-old Child was in the car with her. DCFS took custody of Child and then placed him in foster care with Mother's cousin (Foster Mother).

¶3 Father is a California resident who had not seen Child for approximately six months before Child was placed in foster care. On Child's placement, DCFS began working with Father in an effort to reunite him with Child pursuant to a court order entered in February 2018. To accomplish this, Father was expected to (1) participate in a domestic violence assessment and follow the recommendations from the assessment, (2) participate in a mental health assessment and follow the recommendations from the assessment, (3) participate in a substance abuse assessment and follow the recommendations from the assessment, (4) submit to random drug tests, (5) participate in parenting classes, (6) obtain stable housing and a stable source of income, and (7) maintain consistent contact with Child.

¶4 Father requested services be provided to him in California, and although the DCFS caseworker in Utah "was informed that the State of California does not accept parent

home studies," a caseworker in San Joaquin County, California agreed to do a walkthrough of Father's house. Father also told the DCFS caseworker "that he d[id] not want to begin participating in services until he [knew] if he [wa]s approved for placement for [Child] or not." The caseworker responded by encouraging him to begin services and sending him a list of resources in San Joaquin County. But Father did not accomplish all his goals for reunification, and in September 2018, the State sought termination of reunification services, which the juvenile court granted the following month. The court also determined DCFS had made reasonable efforts to reunify Father and Child.

¶5   In February 2019, following a bench trial, the juvenile court terminated Father's parental rights,[1] finding Father neglected Child and made "only token efforts" to communicate with or support Child, demonstrated "unfitness and failure of parental adjustment," and showed "unwillingness or inability to remedy circumstances that led to Child's out of home placement." It also found that DCFS made reasonable efforts to reunify Father and Child and that it was in the best interest of Child to terminate Father's parental rights. The court then concluded termination was strictly necessary for Child's best interests. The court's findings supporting this conclusion are addressed in turn.

*Neglect*

¶6   The court found Father neglected Child based on Father and Mother's "history of domestic violence," including Father calling Mother names "11–20 times in the past year," and "verbal, emotional[,] and physical altercations between them during the period of time that Mother was pregnant with

---

1. Mother's parental rights were likewise terminated, but she is not a party to this appeal.

[Child]." The court said Mother previously claimed that "Father was violent and had left bruises on [Child's] cheeks," although she denied it at trial.[2]

¶7    The court noted Father's "mental health issues" that "cause[] impairment in important area[s] of his life functioning" and recognized that although "the probability of significant deterioration in life functioning is high if not in treatment," Father did "not engage in on-going counseling for his mental health." Father claimed "his mental health conditions would not impact his ability to care for [C]hild," but the court found Father's "untreated mental health conditions likely" render him "unable to provide care for the immediate and continuing physical and emotional needs of [Child] for extended periods of time, without ongoing treatment and intervention."

¶8    Although Father took a drug and alcohol assessment, the court recognized it was "based on self-report and Father did not report any history of drug or alcohol use or abuse . . . and did not report a [conviction for driving under the influence]." The court concluded Father had "some history of the use of drugs or intoxicating substances, the extent of which is unknown."

¶9    Father had not worked for four years and received disability compensation for his "depression, anxiety[,] and obsessive-compulsive disorder." He "testified that he also has an injury to his hand that prevents him from engaging in any type of manual labor." He had not paid child support or "contributed financially to [Child's] physical, emotional[,] or medical care since" Child last lived with him, and he had "not provided [Child] with adequate food, clothing, shelter, education, or other care necessary for [Child's] physical, mental, and emotional health or development." These findings led the court to conclude Father had neglected Child.

---

2. The court found Mother's testimony "wholly unreliable."

*Token Efforts*

¶10    At the time of trial, Child had not lived with Father in nearly two years, in which time Father had only one in-person visit with Child, which Father ended thirty minutes early.[3] Father made "multiple [video call] visits with [Child]" but Child "rarely interacted with" Father. During those visits, Father "trie[d] to be on screen to at least say 'hello' and then he typically just watche[d]" and "end[ed] the . . . visit[s] early" if Child was "upset or in a bad mood." Father said his video calls were inconsistent because "his phone does not work well and he does not have internet at home." Additionally, despite Father's history of domestic violence, the court said he had engaged in "[o]nly a bare minimum of therapy or treatment." The court found these actions amounted to "token efforts to provide support, prevent neglect[,] or to avoid being an unfit parent."

*Unfitness and Failure of Parental Adjustment*

¶11    Child received therapy for "post-traumatic stress and trauma, neglect[,] and suspected physical abuse." Despite this, "Father could not identify the reasons that [C]hild was engaged with therapy." He testified that "'he knows [Child is] sensitive' and 'has special needs' . . . 'ADHD or something like that.'"

---

3. At oral argument, Father's counsel stated he thought Father had to end the visit early because a friend who drove him to Utah needed to leave. But at the termination hearing, Father said Child "just left" the room during the visit and that Child "probably got bored or something." When asked if he recalled being offered time to finish the visit, he responded in the affirmative and said, "But I didn't know how long we had left. I thought it was like less than half an hour or so. He was already, I guess he already got bored of all those toys or something. That's why." The DCFS caseworker testified that Father said he did not "want to force" Child to finish the visit.

Father could not "name [Child's] doctor" and he "did not participate or communicate with the doctor" when Child had surgery; instead relying "on the DCFS caseworker and [F]oster [M]other for information." Father did not speak to Child's preschool teacher and he did "not know" Child's dentist, speech pathologist, physical therapist, audiologist, trauma specialist, or music teacher. He did not "enroll[] or engage[] in any age or developmentally specific and appropriate parenting instruction" and had "no services in place for [C]hild" but he testified that "if [C]hild were placed in his custody he would 'make it a priority.'"

*Unwillingness or Inability to Remedy Circumstances That Led to Child's Out-of-Home Placement*

¶12　The court noted that although "Father testified that he has completed the Child and Family Plan specifically stating he 'has done everything asked of him,'" Child's DCFS caseworker indicated otherwise. Specifically, the caseworker testified that

> Father ha[d] not completed an accurate drug and alcohol assessment that discusses prior DUI charges and suicide attempt by overdose; ha[d] not completed a domestic violence assessment; ha[d] not completed an age appropriate parenting course; ha[d] failed to visit consistently; only participate[d] collaterally on [video] calls; ha[d] failed to consistently provide[] random drug tests and ha[d] failed to engage in any way with [Child's] services.

The court also noted Father "failed to engage in in-person visits," despite DCFS's offer "to pay for food and hotel stays" and he did not complete a background check "until one month after reunification services were terminated." Because Father could not "identify [Child's] needs or needed services" and had "no services engaged for" Child, the court found he was "not

capable of exercising proper and effective parental care in the near future."

*Reasonable Efforts*

¶13    In October 2018, reunification services were terminated. The parties stipulated to consolidating the parental rights termination and permanency hearings, and the court found that DCFS "made reasonable efforts to finalize the permanency goal," which at the time was to reunify Father and Child. On the record before us, Father does not appear to have objected to what DCFS's attorney proffered about the reasonable efforts DCFS made or to the court's ultimate finding of reasonable efforts. In its final order terminating Father's parental rights, the court elaborated that the reasonable efforts included DCFS visiting with the foster family, communicating with Mother and Father "at least twice monthly," and contacting California family services to determine what services such as "random drug testing, mental health treatment, [and] domestic violence treatment and substance abuse treatment" were available in Father's county. The court noted DCFS also "review[ed] and research[ed] curriculum of internet parenting class[es], offer[ed] to pay for brief hotel stays, contact[ed] . . . parents to arrange for [C]hild's medical treatment[,] and purchas[ed] a car seat for [C]hild." But the court found Father "made no significant improvement in [his] parenting skills or [his] understanding of [C]hild's specific needs" and did not demonstrate an "ability to provide a safe, secure[,] and permanent home for [Child]."

*Child's Best Interests*

¶14    Finally, the court determined that termination of Father's parental rights was strictly necessary for Child's best interests. It noted Father had "no established relationship with" Child and could not identify Child's special needs, nor did he "have services in place to address [Child's] behavioral and developmental needs." In contrast, Child had "developed bonds

of love and affect[ion] with" his foster family. Child called his foster parents "mom" and "dad" and "relie[d]" on them, "finding comfort in their care." While in foster care, Child's behavioral and speech problems improved. At the time of trial, Child had lived with his foster family "for approximately half of his life." His foster parents worked with Child's therapist to "be trained in trauma response," and the therapist "believe[d] that removing [Child] from [F]oster [M]other would damage any attachment bonds" he had developed. The court found that the foster parents were "willing to adopt" Child and that they "provide[d] a secure, safe[,] and permanent residence for [Child] free from abuse, neglect[,] or other destructive life style patterns and behaviors." It also found there was "no reasonable or feasible alternative to termination of parental rights that would provide [Child] with safety and security, and a permanent home." The court determined "Permanent Custody and Guardianship would not be appropriate as [Child] has no established bond with . . . Father and is very young," so "no legal basis exist[ed] that would justify a preservation of the parent-child relationship."

## ISSUES AND STANDARDS OF REVIEW

¶15    Father raises two issues on appeal.[4] First, he contends the juvenile court erred when it found DCFS made reasonable

---

4. Father also contends insufficient evidence supported two of the juvenile court's articulated grounds to terminate his parental rights, namely, that he was an unfit parent and that he neglected Child. But the court found additional grounds for termination. It found Father "substantially neglected, willfully refused[,] or [was] unable or unwilling to remedy the circumstances that caused" Child to be placed in foster care and that he would "not be capable of exercising proper and effective parental care," *see* Utah Code Ann. § 78A-6-507(1)(d) (LexisNexis 2018); that Father

(continued…)

efforts to reunify him with Child. A court's determination that DCFS "made reasonable efforts to provide reunification services" involves an "application of statutory law to the facts" that presents a "mixed question[] of fact and law," requiring review of "the juvenile court's factual findings for clear error and its conclusions of law for correctness, affording the court some discretion in applying the law to the facts." *In re M.C.*, 2003 UT App 429, ¶ 16, 82 P.3d 1159 (quotation simplified).

¶16    Second, Father contends the court wrongfully found it was strictly necessary for Child's best interests to terminate his parental rights. "The ultimate decision about whether to terminate a parent's rights presents a mixed question of law and fact. In such situations, we review a [juvenile] court's findings for clear error and its conclusions of law for correctness, affording the court some discretion in applying the law to the

---

(…continued)

"experienced a failure of parental adjustment" in that he was "unable or unwilling within a reasonable time to substantially correct the circumstances, conduct, or conditions that led to" Child's placement in foster care, *see id.* §§ 78A-6-502(2), 507(1)(e); and that he "made only token efforts to support or communicate with [Child], prevent neglect of [Child], eliminate the risk of serious harm to [Child], or to avoid being an unfit parent," *see id.* § 78A-6-507(1)(f). Father does not challenge any of these alternative grounds, and because "the court may terminate all parental rights with respect to a parent if the court finds any one" of the enumerated statutory grounds for termination, *see id.* § 78A-6-507(1), we do not reach the merits of Father's insufficiency-of-the-evidence argument, *see Howick v. Salt Lake City Corp.*, 2018 UT 20, ¶ 5, 424 P.3d 841 (noting an appellate court "will not reverse a ruling of the district court that rests on independent alternative grounds where the appellant challenges only [some] of those grounds" (quotation simplified)).

facts." *In re B.T.B.*, 2018 UT App 157, ¶ 8, 436 P.3d 206 (quotation simplified), *cert. granted*, 440 P.3d 692 (Utah 2019).

ANALYSIS

I. Reasonable Efforts

¶17 The juvenile court terminated reunification services in October 2018. And according to the court's findings upon termination of parental rights after trial in February 2019, Father stipulated to the finding that DCFS made reasonable efforts toward reunification services. At oral argument before this court, Father argued he never stipulated to DCFS's reasonable efforts and said the court's finding of a stipulation was error. In support of this contention, he points to a minute entry and order from the permanency hearing that says, "Based on the stipulation of the parties, the permanency and the termination matter is consolidated." On this record, it does appear that the court's finding of a stipulation as to whether DCFS's efforts to reunify Father and Child were reasonable was perhaps broader than the parties intended. But, as Father conceded at oral argument, he did not object to what appears to be an error in the court's ruling. *See In re M.W.*, 2000 UT 79, ¶ 29, 12 P.3d 80 (declining to consider unpreserved claim of DCFS's failure to make reasonable efforts).

¶18 In any event, we exercise our discretion to reach the merits of this issue, *see State v. Johnson*, 2017 UT 76, ¶¶ 41–43, 416 P.3d 443 (affirming that the Utah Court of Appeals has discretion to reach waived or unpreserved issues), and affirm the court's finding that DCFS made reasonable efforts to reunify Father and Child. These efforts included the caseworker visiting Child monthly at the foster home; arranging services for Child through Early Intervention; maintaining contact with Child's care providers; "at least twice monthly contact[ing] . . . Father by phone or text or email[;] discussing services with [Father;] responding to questions from . . . Father[;] arrang[ing] and

scheduling [video call] visits [with Father]"; completing paperwork for Father to determine if the case could be transferred to California; "making[] multiple contacts with California family services regarding services available to [Father] . . . in areas of random drug testing, mental health treatment, domestic violence treatment[,] and substance abuse treatment; review[ing] and researching curriculum of internet parenting class[es]; offering to pay for brief hotel stays"; communicating with Father regarding Child's medical treatment; and purchasing a car seat for Child.

¶19 Father has not met his burden on appeal to demonstrate that the services provided or offered by DCFS were inadequate or insufficient or that the juvenile court erred in making this determination. *See In re A.W.*, 2018 UT App 217, ¶¶ 30, 31, 437 P.3d 640 (affirming a finding of reasonable efforts where the father failed "to identify any facts in the record that suggest DCFS did not make reasonable efforts to provide him with reunification" and ignored "several times in the record in which the juvenile court made an unchallenged periodic finding— before its termination order—that DCFS had made reasonable efforts to provide him with reunification services"); *In re K.K.*, 2017 UT App 58, ¶ 5, 397 P.3d 745 (per curiam) ("The process of reunification is a two way street which requires commitment on the part of the parents, as well as the availability of services from the State." (quotation simplified)). Father has not engaged with the court's determination as to what DCFS did do and has not shown how these efforts were not sufficient.

¶20 While Father argues on appeal that DCFS's assistance was inadequate, that DCFS could not pay for certain services for him because he lived out of state, that he did not have the financial resources to travel to Utah or to pay for certain treatment, and that the evaluations and assessments he did obtain failed to meet DCFS's standards and requirements, these alleged challenges are not failures on the part of DCFS. And Father's complaints about what he considers to be insufficient help from DCFS should have

been brought to the attention of the juvenile court to address before the termination trial. Further, the court determined, "Despite these efforts[, Father] ha[s] made only minimal effort to address [his] past conduct or behavior and ha[s] demonstrated little improvement in [his] overall parenting ability and ability to provide a safe, secure[,] and permanent home for [Child]." We are sympathetic to Father's situation, but his challenge to the services provided and the efforts made by DCFS prior to the trial is unpersuasive.

## II. Child's Best Interests

¶21　To terminate a parent's rights to his or her child, the juvenile court must make two findings. First, the "court must find that one or more of the statutory grounds for termination are present." *In re B.T.B.*, 2018 UT App 157, ¶ 13, 436 P.3d 206, *cert. granted*, 440 P.3d 692 (Utah 2019). Second, the "court must find that termination of the parent's rights is in the best interests of the child." *Id.* (quotation simplified); *see also* Utah Code Ann. §§ 78A-6-503(12), -507(1) (LexisNexis 2018). These findings must be supported by clear and convincing evidence. *In re B.T.B.*, 2018 UT App 157, ¶ 13. Because a "court's final decision regarding termination of parental rights should be afforded a high degree of deference," we "will overturn a termination decision only when the result is against the clear weight of the evidence or leaves us with a firm and definite conviction that a mistake has been made." *In re C.R.C.*, 2019 UT App 153, ¶ 24, 450 P.3d 1169 (quotation simplified).

¶22　Here, the court found Father neglected Child; he was an "unfit or incompetent parent[]"; he "substantially neglected, willfully refused[,] or [was] unable or unwilling to remedy the circumstances that caused" Child to be placed in foster care and he would "not be capable of exercising proper and effective parental care"; he "experienced a failure of parental adjustment" in that he was "unable or unwilling within a reasonable time to substantially correct the circumstances, conduct, or conditions

that led to" Child's placement in foster care; and he "made only token efforts to support or communicate with [Child], prevent neglect of [Child], eliminate the risk of serious harm to [Child], . . . or to avoid being an unfit parent." *See* Utah Code Ann. § 78A-6-507(1)(b)–(f). Because the court need only make a finding as to one statutory ground for termination, *id.* § 78A-6-507(1), and because Father challenges only two of the five grounds on which the court supported termination, *see supra* ¶ 15 n.4, we conclude the court sufficiently made the first finding and turn our attention to whether termination was in Child's best interests.

¶23 "Because the relationship between parent and child is constitutionally protected, a court may only terminate parental rights upon a finding that termination is strictly necessary to the best interests of the child." *In re C.T.*, 2018 UT App 233, ¶ 12, 438 P.3d 100 (quotation simplified); *see also* Utah Code Ann. § 78A-6-507(1). The best interest inquiry is "a subjective assessment based on the totality of the circumstances surrounding the child," *In re B.T.B.*, 2018 UT App 157, ¶ 47, (quotation simplified), taken from the child's point of view, and mandates a court "terminate parental rights only in situations when it is absolutely essential to do so," *id.* ¶ 54. In conducting the best interests inquiry, the court must also "explore whether other feasible options exist that could address the specific problems or issues facing the family." *Id.* ¶ 55.

¶24 Father claims the court failed to consider "any alternatives to termination of [his] parental rights." But a court need only "*consider or explore* alternatives to termination"; if it finds "no such alternatives are available or articulates supported reasons for rejecting alternatives that do exist, such findings are entitled to deference on appeal," *In re C.T.*, 2018 UT App 233, ¶ 16, and the court did that here. Initially, the court ordered reunification as DCFS's goal for Father and Child. But, after determining DCFS made reasonable efforts to reunify Father and Child, which efforts were described in the court's

termination order, the court changed Child's primary permanency goal from reunification with Father and terminated reunification services. And before terminating Father's parental rights, the court concluded there were "no reasonable or feasible alternative[s] to termination of parental rights that would provide [Child] with safety and security, and a permanent home." Specifically, the court found that "Permanent Custody and Guardianship would not be appropriate as [Child] has no established bond with . . . Father and is very young." The court also found that the foster family was "willing to adopt" Child, which would provide Child with much needed stability and permanency and could not occur absent termination of parental rights.

¶25  But the court did not end its analysis there. In its best interest inquiry, the court found it significant that Child and Father had "no established relationship," that Father had not participated in Child's therapy, and that Child has special needs that Father cannot identify. Specifically, the court heard testimony that a child suffering from Child's symptoms "needs a secure attachment to ensure optimal future development. The secure attachment requires a caregiver who can manage [Child's] affect, is attuned to his needs, can provide a consistent response[,] and provide a routine." The court found that Father did not have services in place to address Child's behavioral and developmental needs. On the other hand, Child had "developed bonds of love and affect[ion]" with his foster family; Child's behavioral and speech problems improved while in his foster family's care; and the foster family attended therapy with him and became "trained in trauma response," had services in place to meet Child's special needs, and had cared for him "for approximately half of his life." The court also noted the foster family "provide[d] a secure, safe[,] and permanent residence . . . free from abuse, neglect[,] or other destructive life style patterns and behaviors." We conclude the court did not err in determining it was strictly necessary to terminate Father's parental rights.

CONCLUSION

¶26 Father did not adequately carry his burden on appeal in challenging the juvenile court's finding that DCFS made reasonable efforts to reunify him and Child. Additionally, the court did not err when it found terminating Father's parental rights was strictly necessary to Child's best interests and Father did not challenge all the statutory grounds that supported termination. Accordingly, we affirm.

—————