**2018 UT App 233**

# THE UTAH COURT OF APPEALS

STATE OF UTAH, IN THE INTEREST OF C.T.,
A PERSON UNDER EIGHTEEN YEARS OF AGE.

A.T.,
Appellant,
*v.*
STATE OF UTAH,
Appellee.

Opinion
No. 20180435-CA
Filed December 20, 2018

Third District Juvenile Court, Salt Lake Department
The Honorable Julie V. Lund
No. 1137406

Sheleigh A. Harding, Attorney for Appellant

Sean D. Reyes, Carol L.C. Verdoia, and John M.
Peterson, Attorneys for Appellee

Jeannine Timothy, Guardian ad Litem

JUDGE DIANA HAGEN authored this Opinion, in which
JUDGES DAVID N. MORTENSEN and RYAN M. HARRIS concurred.

HAGEN, Judge:

¶1     A.T. (Mother) appeals the termination of her parental rights as to C.T. (Child), arguing that termination was not in Child's best interest. Mother relies on this court's recent decision in *In re B.T.B.*, 2018 UT App 157, contending that termination was not strictly necessary because the juvenile court could have allowed Mother's parents (Grandparents) to have guardianship of Child. In *B.T.B*, we concluded that a court may not find that termination of parental rights is strictly necessary until it has

considered or explored "less-permanent arrangements," such as custody or guardianship with a family member. *Id.* ¶ 55. Because the juvenile court correctly applied our holding in *B.T.B.* by exploring guardianship and custody with Grandparents before terminating Mother's parental rights, we affirm.

BACKGROUND

¶2      Mother is a minor who lives with Grandparents and her five younger siblings. Mother has been a caretaker of her younger siblings since she was eleven. When Mother was thirteen, she was allegedly sex-trafficked by her older sister, and became pregnant and contracted HIV as a result of rape by an unknown man. At that time, the Division of Child and Family Services (DCFS) took custody of Mother.

¶3      Mother gave birth to Child at the age of fourteen and was returned to Grandparents' custody. Shortly after the birth, DCFS received a report that Mother had threatened to kill herself and Child. DCFS found Mother and Child living in a park and placed both in DCFS custody.[1] Mother denied that she intended to harm Child but threatened to harm herself if forced to return to Grandparents' home at that time. DCFS filed abuse, neglect, and dependency petitions as to Mother and Child. At a shelter hearing in Child's case, the juvenile court made findings that Mother had been adjudicated incompetent to stand trial in a

---

1. Mother and Child remained in DCFS custody for a period of weeks. Grandparents later received reunification services and Mother was ultimately returned to their custody. Although Mother's and Child's child protection cases were adjudicated simultaneously, Grandparents' fitness as parents to Mother is not at issue in this appeal.

previous delinquency matter and that she and Child should remain in DCFS custody.

¶4 Mother and Child were placed by DCFS into a girls' group home. While there, Mother engaged in multiple outbursts in which she made ostensibly aggressive and threatening comments toward Child. Mother also threatened to take her own life again but later testified that she was just angry and that she did not mean what she said. At one point during their stay at the group home, Child was removed from Mother and taken to the hospital because Child was dehydrated. The staff at the group home indicated that Mother needed ongoing supervision "regarding the most basic caregiving skills" for Child. The psychologist who later evaluated Mother drew a similar conclusion, testifying that Mother "does not have a bond with [Child]" and "does not have the cognitive capacity to make decisions for [Child] and keep her safe."

¶5 Mother eventually returned to Grandparents' home, but Child was placed with foster parents, who were friends of Mother and Grandparents. The juvenile court ordered reunification with Mother as the primary permanency goal for Child and adoption as the secondary goal. The court also ordered reunification services for Mother that required her to participate in "therapy to address her past trauma," take medication and monitor the progression of her HIV, attend school, "work with her peer parent to gain parenting skills," and have supervised visitation with Child. DCFS also recommended that Grandparents attend family therapy with Mother.

¶6 Although Mother attended individual therapy, she was never given a psychological evaluation, and Mother and Grandparents did not participate in family therapy. In addition, Mother did not participate in peer parenting and failed to take the medication as prescribed to address her HIV and emotional issues. DCFS explained at Mother's termination trial that it had

failed to secure peer parenting resources because peer parenting had been unsuccessful during Mother's previous case.

¶7    After Mother failed to complete reunification services, the court changed the primary permanency goal for Child to permanent custody and guardianship with Grandparents.[2] Guardianship with Grandparents remained the primary permanency goal for only one month. At the end of the one-month period, DCFS requested that the primary goal be changed to adoption, citing a number of ongoing concerns. DCFS expressed concern about Child remaining in Grandparents' home because Grandparents had failed to make sure that Mother attended medical appointments relating to her HIV infection, had failed to ensure that Mother's medication was "filled and taken on a consistent basis," had failed to participate in peer parenting, and had allowed Mother's older sister, who allegedly sex-trafficked and assaulted Mother, back into the home. DCFS was also concerned about Grandparents' financial ability to care for Child and the fact that the home was not kept clean and only had one bathroom. Furthermore, although Grandparents had placed Mother's younger siblings in daycare, there were still hours during the day where Mother was the primary caregiver for her siblings. Thus, if Child was returned to Grandparents' home, Mother would also be caring for Child without supervision during those times. Based on these concerns, the juvenile court changed the primary permanency goal for Child to adoption.

¶8    Following this final change to Child's permanency goal, Child remained in the care of her foster parents. Child bonded

---

2. Both parties acknowledge that the juvenile court was unable to set the goal as adoption by Grandparents because Grandparents are present in the United States under refugee status and are therefore unable to legally adopt.

with her foster parents and they expressed a desire to adopt. Child's foster parents also expressed a desire that Child continue to have a relationship with her biological family and remain connected to her heritage, "as long as it doesn't cause her anxiety, or angst, or confusion in any way that is harmful to her growth and development."

¶9 A few months after Child's primary permanency goal was changed to adoption, the juvenile court held a trial on the termination of Mother's parental rights. Upon hearing testimony from a psychologist, Mother, DCFS, Child's grandmother, and Child's foster mother, the court entered findings of fact and conclusions of law and an order terminating Mother's parental rights. As grounds for termination, the court found that Mother had neglected Child and was an unfit or incompetent parent. The court also found that guardianship with Grandparents was "untenable" because Mother, "as a child herself, was the child in her home providing the [care-giving] to her younger siblings in the home, and would therefore also, of necessity, be providing the primary care to [Child]," despite Mother's continuing "emotional instability." Because of Mother's unfitness, and after finding that termination of her parental rights was strictly necessary, the court concluded that adoption was in Child's best interest.

¶10 Mother appeals.

ISSUE AND STANDARD OF REVIEW

¶11 Mother appeals the termination of her parental rights as to Child, contending that the juvenile court erred in concluding that termination was in Child's best interest. "The ultimate decision about whether to terminate a parent's rights presents a mixed question of law and fact." *In re B.T.B*, 2018 UT App 157, ¶ 8 (quotation simplified). "We afford great deference to the

juvenile court's findings of fact and overturn the result only if the facts are against the clear weight of the evidence," but we review the court's "interpretation of the Termination of the Parental Rights Act for correctness." *In re A.C.M.*, 2009 UT 30, ¶ 8, 221 P.3d 185.

## ANALYSIS

¶12 Mother argues that "the juvenile court erred in terminating [her] parental rights without fully exploring whether [Child's] best interests would be better served by awarding permanent custody and guardianship of [Child] to [Grandparents]." "To terminate parental rights, [a] juvenile court must make two separate findings." *In re T.E.*, 2011 UT 51, ¶ 17, 266 P.3d 739 (quotation simplified). First, a "court must find by clear and convincing evidence that there is at least one statutory ground for termination." *Id.; see also* Utah Code Ann. § 78A-6-507 (LexisNexis 2012) (setting forth grounds for termination). Second, a court must "find that termination of the parent's rights is in the best interests of the child." *In re A.C.M.*, 2009 UT 30, ¶ 23, 221 P.3d 185. Because "the relationship between parent and child is constitutionally protected," *In re J.P.*, 648 P.2d 1364, 1372 (Utah 1982) (quotation simplified), a court may only terminate parental rights upon a finding that termination is "strictly necessary" to the best interests of the child, Utah Code Ann. § 78A-6-507(1).

¶13 On appeal, Mother does not challenge the juvenile court's finding that there are statutory grounds for termination. Instead, she challenges the court's finding that termination was in Child's best interest and, specifically, that "it was strictly necessary to terminate [her] parental rights given the existence of family members who could have raised [Child]." To support this argument, Mother relies on *In re B.T.B*, 2018 UT App 157. In that case, this court addressed "whether [a] juvenile court correctly

applied the 'strictly necessary' language to the historical test for termination of parental rights." *Id.* ¶ 7. In framing our interpretation of the "strictly necessary" language, this court discussed Utah's legal standards for terminating parental rights and our supreme court's interpretation of those standards, noting that "every indication from our legislature and our supreme court demonstrates that our law has had, and continues to have, a rigorous test" that must be met in order to terminate parental rights. *Id.* ¶ 18. The court observed that the second step of that rigorous test—the best interest analysis—"is broad, and is intended as a holistic examination of all of the relevant circumstances that might affect a child's situation." *Id.* ¶ 47. Ultimately, the court concluded that "trial courts should analyze whether termination of a child's parent's rights is 'strictly necessary'" "as part of the 'best interest' analysis required by the second element of the two-part [termination] test." *Id.* ¶ 50.

¶14     After concluding that the "strictly necessary" finding was part of the best interest analysis, the court went on to define the term as it operates in Utah Code section 78A-6-507. *Id.* ¶¶ 51–53. Looking to dictionary definitions of "strictly" and "necessary" and the legislature's decision to place the two words together in the statute, the court concluded that the statutory requirement that courts find termination of parental rights "strictly necessary" means that "the legislature intended for courts to terminate parental rights only in situations when it is absolutely essential to do so." *Id.* ¶¶ 52–54. In order to make this finding, courts must examine "all of the relevant facts and circumstances surrounding the child's situation, not just the specific statutory grounds for termination." *Id.* ¶ 55. As part of this examination, courts must "explore whether other feasible options exist that could address the specific problems or issues facing the family, short of imposing the ultimate remedy of terminating the parent's rights" and "should consider whether other less-permanent arrangements (for instance, a guardianship with

a family member) might serve the child's needs just as well in the short term, while preserving the possibility for rehabilitation of the parent-child relationship in the longer term." *Id.*

¶15 It is this principle—that courts must consider alternatives to termination and adoption such as guardianship with family members—on which Mother's claim of error rests. Mother contends that the juvenile court failed to adequately explore Child's placement with Grandparents as an alternative to termination and adoption. Although Mother acknowledges that the juvenile court set permanent custody and guardianship of Child with Grandparents as a permanency goal for a time, Mother contends that no services were given to Grandparents "to fully explore that goal." Neither the State nor the Guardian ad Litem dispute this contention, and the DCFS caseworker admitted at the termination trial that neither Grandparents nor DCFS made any progress toward the guardianship goal. But nothing in *B.T.B.* suggests that certain services must be provided before a juvenile court may determine that such alternatives are not viable.

¶16 Instead, *B.T.B.* simply stands for the proposition that juvenile courts must *consider or explore* alternatives to termination of parental rights before they may find that termination is "strictly necessary" to the best interests of the child. *See id.* After this consideration, if a juvenile court determines that no such alternatives are available or articulates supported reasons for rejecting alternatives that do exist, such findings are entitled to deference on appeal. Here, the juvenile court not only considered guardianship with Grandparents, but also made this arrangement a permanency goal in Child's case. It quickly became clear, however, that this arrangement was not in Child's best interest. During the time when custody and guardianship with Grandparents was the permanency goal, the juvenile court found that Mother was still in Grandparents' home and was providing unsupervised child care for the

younger siblings despite the fact that Mother's "emotional instability continued." With these circumstances in mind, the court changed the permanency goal to termination and adoption. It determined that Child "could not and should not return to" Mother and Grandparents' home because Mother was unfit to care for Child and Grandparents could not provide adequate supervision. Thus, not only did the juvenile court consider alternatives to termination, the court specifically explored permanent custody and guardianship with family members, but rejected those options for well-articulated reasons.

¶17    Contrary to Mother's argument, nothing in this court's decision in *B.T.B* requires courts to do anything more than "explore whether other feasible options exist" and "consider whether other less-permanent arrangements . . . might serve [Child's] needs just as well" as termination of parental rights. *Id.* Here, the juvenile court did more than consider and explore an alternative to termination; the court ordered custody and guardianship with Grandparents as a permanency goal. Only after exploring this placement and finding that this arrangement was not in Child's best interest did the court order termination and adoption as Child's permanency goal. Accordingly, because the court did consider and explore alternatives before finding that termination of Mother's parental rights was necessary, we affirm.

CONCLUSION

¶18    We reject Mother's argument that DCFS was required to provide additional services to Grandparents as guardians of Child before the juvenile court could find that termination of Mother's parental rights was strictly necessary, and we affirm the juvenile court's finding that termination of Mother's parental rights was in Child's best interest.

———————