**2019 UT App 153**

# THE UTAH COURT OF APPEALS

STATE OF UTAH, IN THE INTEREST OF C.R.C.,
A PERSON UNDER EIGHTEEN YEARS OF AGE.

S.C. AND D.C.,
Appellants,
*v.*
STATE OF UTAH,
Appellee.

Opinion
Nos. 20190233-CA and 20190234-CA
Filed September 19, 2019

Eighth District Juvenile Court, Vernal Department
The Honorable Ryan B. Evershed
No. 1142757

Emily Adams and Jeffry K. Ross, Attorneys
for Appellant S.C.

A. Erin Bradley, Attorney for Appellant D.C.

Sean D. Reyes, Carol L.C. Verdoia, and John M.
Peterson, Attorneys for Appellee

Martha Pierce, Guardian ad Litem

JUDGE KATE APPLEBY authored this Opinion, in which
JUDGES RYAN M. HARRIS and DIANA HAGEN concurred.

APPLEBY, Judge:

¶1 S.C. (Mother) and D.C. (Father) (collectively, Parents) appeal the juvenile court's termination of their parental rights as

to C.R.C. (Child).[1] Mother argues that insufficient evidence supported the juvenile court's determination that grounds existed to terminate her rights. Parents also argue that terminating their rights is not in Child's best interest. We affirm.

BACKGROUND

¶2 In early 2017, police discovered that Father had downloaded hundreds of photographs and videos of child pornography. Many of the images involved children as young as newborns and toddlers. Father admitted to downloading the images and was arrested. He has been incarcerated since. Police informed Mother of the allegations against Father and warned her that Child, who was born shortly after Father's arrest, was not safe around him. Mother was advised to seek a protective order for Child against Father, but she never sought one. Police eventually obtained an ex parte protective order on Child's behalf. The protective order prohibited Father from having contact with Child unless the visit was supervised by the Division of Child and Family Services (DCFS). Despite this court order, Mother took Child to the prison to see Father. This incident was reported to DCFS and Mother was reminded not to allow contact between Child and Father.

¶3 In March 2017, Father was temporarily released from jail to obtain a psychosexual evaluation. Mother asked if Father could see Child during his release, but DCFS again instructed her not to allow contact between them. Mother ignored these instructions and allowed Father to spend "unfettered and

---

1. Father filed a separate appeal but did not file an opening brief and instead joined in Mother's brief. We therefore resolve both cases together in this opinion.

unsupervised" time with Child. Mother told DCFS she permitted the contact because Father was not a risk to Child. After this incident came to light, DCFS removed Child from Mother's custody and Child was placed in foster care.

¶4 While Child was in foster care, Mother was required to complete a reunification plan (Plan), which included, among other things, (1) establishing safe and stable housing for herself and Child, (2) maintaining contact with her caseworker so she could have parent time with Child, (3) completing a parental fitness evaluation, (4) completing a parenting class and working with a "peer parent," and (5) complying with the no-contact order by preventing Father from contacting Child.

¶5 In accordance with the Plan, Mother sought a parental fitness evaluation. But the juvenile court concluded that she was unable to complete it because she "could not understand many of the questions, even when they were read to her" and that the "evaluation raised many concerns regarding Mother's ability to adequately parent" Child. The evaluation report concluded that Mother has an intelligence quotient "in the extremely low range of intellectual classification" and that Mother has an overall intellectual capacity of a ten- or eleven-year-old child. But the court noted that Mother improved her housework and parenting skills after attending behavioral therapy. Overall, the court concluded that Mother could not be a successful parent without "maintaining firm boundaries and obtaining a support system."

¶6 Mother attempted to obtain an adequate support system. First, she identified her own mother (Grandmother) as a potential supervisor. Grandmother participated in a parental fitness evaluation, but this demonstrated that she, too, suffered from serious intellectual deficiencies. The court found that Grandmother and Mother frequently undermined each other and that Grandmother had a boyfriend who could not pass a

background check. The court concluded that Grandmother was an inappropriate supervisor for Mother and Child. Next, Mother identified her father (Grandfather) as a potential supervisor. Grandfather resided in Colorado and therefore was not an option as a long-term supervisor. Finally, Mother identified a friend (Friend) as a potential supervisor. Friend agreed to supervise Mother's parent-time with Child and Friend was found to be an adequate supervisor. Friend testified that the get-togethers went well. Friend began attending family team meetings with Mother and provided her support "in many ways."

¶7 But in early 2018, Friend discovered that Mother had been dishonest with DCFS regarding her contact with Father and became concerned about Child's safety. At trial, Friend's daughter testified that she was driving with Mother one day and asked Mother whether she had any overnights planned with Child. Mother responded, "[N]o, I think [DCFS personnel] know if I had overnights then I would call [Grandfather] to come get us and I would leave with them." Mother added that she "couldn't wait until she had her family back together" and she wanted to have "more kids" with Father. After this, Friend stopped providing support to Mother. The court concluded that Mother was never able to establish the long-term support system she needed to be reunited with Child.

¶8 Mother's parental fitness evaluation report also noted Mother struggled to maintain firm boundaries and observed that this made her "an easy target to be taken advantage of due to her [intellectual] difficulties." Friend reported to DCFS that Mother had "significant secret contact with Father in prison." DCFS asked Mother about this and Mother "adamantly denied any contact" and expressed her desire to divorce Father because any contact would be harmful to Child. Nevertheless, Mother continued to contact Father. In September 2017, a caseworker

again asked Mother if she had spoken with Father, and Mother said she had not. But in the two months following this conversation, Mother spoke with Father on the telephone for 443 minutes and deposited $632 in his prison account. After this, Mother met with a caseworker and again denied having any contact with Father. That same day, Mother had a 27-minute phone call with him. At a family team meeting several months later, Mother stated she had no contact with Father even though she made four separate phone calls to Father that day for a total of 58 minutes. From the first time Mother told her caseworker she had no contact with Father until the family team meeting, Mother had 428 phone calls with Father and deposited $2,358 in his prison account. At another family team meeting, Mother was again warned not to have any contact with Father. Between that time and the permanency placement hearing one month later, Mother spoke to Father on the telephone 32 times for a total of 307 minutes. Over the next several months, Mother had 16 in-person prison visits with Father, had approximately 650 phone conversations with him, and deposited $1,135 in his prison account.

¶9 The court found Mother's continual contact with Father "very concerning" on many levels because "Father [was] a danger to [Child] and Mother was made aware of this." It stated, "Mother has demonstrated that she is committed to Father and does not believe he is a risk to [Child]" and has "demonstrated that she will be deceitful with DCFS and the Court in an attempt to continue the relationship." Mother and Father were also "aware that ongoing contact between the two of them undermined Mother's potential for success." Based on the court's many concerns, it concluded that Mother would not be able to protect Child from Father or other potential abusers. It also found that Mother was "an easy target to be taken advantage of" and that Child was an "easy target[] for abuse and neglect if Mother is the sole caretaker." The parental fitness

evaluation report also described Mother as "unwilling" to stay away from Father and stated that she "made the conscious decision to continue contact with [him] knowing it would be detrimental to her success."

¶10 At the termination trial, the court concluded that Mother made significant progress on the Plan by keeping in contact with her caseworker and seeing Child on a regular basis, obtaining a parental fitness evaluation, completing the parenting class, complying with the peer-parenting program, and establishing housing. But it concluded that she "was never able to complete the goals of the Plan by providing an appropriate home for [Child] where [Child] would be safe from abuse and neglect." In point of fact, the court was concerned with Mother's continual contact with Father, her belief that he was not a threat to Child, and her lack of a support system.

¶11 The juvenile court found that several grounds supported terminating Parents' parental rights. First, it concluded that they were "unwilling or unable to avoid their parental incompetence" and neglect. It found that Father was incarcerated as a result of multiple felony convictions and that the sentence was long enough that Child would be deprived of a normal home for more than one year. Further, the fact that Father was convicted for possessing child pornography indicated his unfitness to provide adequate care to Child. It also found that Mother suffered "from an emotional illness, mental illness, or mental deficiency" that rendered "her unable to care for the immediate and continuing physical or emotional needs of [Child] for extended periods of time." While Mother "may be able to complete up to ninety percent of the parenting required to take care of [Child]," "[Child] is not safe with [Mother] on a long-term basis without ongoing support from a third party" and "[n]o ongoing third party support was ever established." Finally, the court found that Mother had failed to make parental

adjustment[2] and was unwilling or unable to remedy the circumstances that led to Child being placed in foster care.

¶12 Next, the court determined that terminating Parents' rights was in Child's best interest. It found that Child was placed in foster care before she was two months old and was never returned to Mother's care.[3] Also, Mother never reached the point where she was allowed overnight parent time during the reunification period. When Child was placed in foster care she was "very dirty," looked "extremely sick and underweight," and was diagnosed with failure to thrive.

¶13 Conversely, the court found that Child's foster parents "have provided the care and stability that she never received while under the care of [Mother]." Child was "part of a permanent foster family where the parents have been married for almost 16 years, have successfully raised other children," have "lived in the same area for years," and have expressed a willingness to adopt Child. Further, Child and her foster parents "developed bonds of love and affection for one another." Child has "thrived in the foster parents' home" and "has made remarkable strides . . . both emotionally and physically." The court stated that there "is no comparison [between] the two

---

2. "'Failure of parental adjustment' means that a parent or parents are unable or unwilling within a reasonable time to substantially correct the circumstances, conduct, or conditions that led to placement of their child outside of their home, notwithstanding reasonable and appropriate efforts made by the Division of Child and Family Services to return the child to that home." *See* Utah Code Ann. § 78A-6-502(2) (LexisNexis 2018).

3. Child has never lived with Father; he has been incarcerated since before her birth.

homes as far as parenting ability." Child's foster parents "significantly altered their lives to care for [Child]" and "have taken multiple steps to improve [Child's] life and ability to function in society." The court compared these efforts to those of Parents, who were "unwilling or unable to do the same." Ultimately, the court concluded that Child is "settled" in the foster parents' home, she has stronger emotional ties with them than she does with Parents, and moving her from that home would be detrimental to Child's well-being. The court noted Mother's "respectable effort to adjust her circumstances," but found it was not enough to consider it in Child's best interest to return Child to her. Ultimately, the court concluded that it was strictly necessary to terminate Parents' rights and that adoption was in Child's best interest because it would satisfy her need for safety, stability, and permanency.

¶14　Parents appeal.

## ISSUES AND STANDARDS OF REVIEW

¶15　Parents raise two main issues on appeal. First, Mother contends insufficient evidence supports the juvenile court's finding that statutory grounds existed to terminate her parental rights.[4] "We apply a clearly erroneous standard in determining whether the juvenile court's findings are based upon sufficient evidence." *In re A.W.*, 2018 UT App 217, ¶ 23, 437 P.3d 640

---

4. Father concedes statutory grounds existed to terminate his rights under Utah Code section 78A-6-508(2)(e) because he is "incarcerated as a result of conviction of a felony, and the sentence is of such length that [Child] will be deprived of a normal home for more than one year." *See* Utah Code Ann. § 78A-6-508(2)(e) (LexisNexis Supp. 2019).

(quotation simplified). Under this standard, we will not overturn the court's determination unless the result is "against the clear weight of the evidence" or leaves us "with a firm and definite conviction that a mistake has been made." *In re B.T.B.*, 2018 UT App 157, ¶ 8, 436 P.3d 206 (quotation simplified), *cert. granted*, 440 P.3d 692 (Utah 2019).

¶16 Second, Parents argue that insufficient evidence supports the juvenile court's determination that it was in Child's best interest to terminate their parental rights. "Due to the factually intense nature of the analysis, a [juvenile] court's final decision regarding termination of parental rights should be afforded a high degree of deference," and this court will overturn a termination decision only when the result is "against the clear weight of the evidence" or leaves us "with a firm and definite conviction that a mistake has been made." *Id.* (quotation simplified).

## ANALYSIS

¶17 "To terminate parental rights, a juvenile court must make two separate findings." *In re C.T.*, 2018 UT App 233, ¶ 12, 438 P.3d 100 (quotation simplified). First, the court must find "that there is at least one statutory ground for termination." *Id.* (quotation simplified); *see also* Utah Code Ann. § 78A-6-507 (LexisNexis 2018). "Second, a court must find that termination of the parent's rights is in the best interests of the child." *In re C.T.*, 2018 UT App 233, ¶ 12 (quotation simplified).

¶18 Mother argues that the juvenile court erred in terminating her parental rights because there was insufficient evidence to support a finding that there are statutory grounds for termination. Parents also argue that termination was not in Child's best interest. We address each issue in turn.

I. Grounds for Termination

¶19 Mother argues that the evidence presented at trial did not support the grounds the juvenile court found for terminating her rights. We disagree. A court may terminate parental rights on any one of the grounds articulated in Utah Code section 78A-6-507. "Among other things, a juvenile court may terminate parental rights if the court finds that a parent has either abandoned a child, neglected a child, or is an unfit or incompetent parent." *In re A.W.*, 2018 UT App 217, ¶ 35, 437 P.3d 640 (quotation simplified). Further, "when a foundation for such findings exists in the evidence, we do not engage in" reweighing the evidence on appeal. *Id.* (quotation simplified).

¶20 The juvenile court terminated Mother's parental rights on several grounds. First, it found Mother was unwilling or unable to remedy her parental incompetence and neglect. *See* Utah Code Ann. § 78A-6-507(1)(b)–(c) (LexisNexis 2018). Second, it found that Child was being cared for in an "out-of-home placement under the supervision of the court" and Mother had "substantially neglected, willfully refused, or ha[d] been unable or unwilling to remedy the circumstances that cause[d] [Child] to be in an out-of-home placement; and . . . there is a substantial likelihood that [Mother] will not be capable of exercising proper and effective parental care in the near future." *See id.* § 78A-6-507(1)(d). Finally, the court found Mother failed to make her parental adjustment. *See id.* § 78A-6-507(e).

¶21 We conclude that a sufficient foundation exists for each of the grounds the court relied on to terminate Mother's parental rights. With respect to neglect and incompetence, the court found that Mother suffers from "emotional illness, mental illness, or mental deficiency . . . that renders [her] unable to care for the immediate and continuing physical or emotional needs of [Child] for extended periods of time." *See id.* § 78A-6-508(2)(a)

(Supp. 2019). Specifically, the court found that although Mother may be able to complete a majority of the tasks necessary to care for Child, Child "is not safe with [Mother] on a long-term basis without ongoing support from a third party" and a third-party caregiver was never established. Here, the court relied on the evidence that, without a support system, Mother's mental deficiencies rendered her unable to adequately care for Child and protect her from Father. The court also found that Mother demonstrated that she valued her relationship with Father above caring for and protecting Child. The court and the parental evaluation report concluded that Mother had the ability to refrain from contacting Father and to focus on reuniting with Child, but she continued to express her desire to reunite with Father and contacted him almost daily. We conclude that this evidence provides sufficient support for the court's finding that Mother was unwilling or unable to remedy her parental incompetence and neglect.

¶22 The court also found that Mother refused to remedy the circumstances that caused Child to be in an out-of-home placement and failed to meet the Plan's goals. The court noted that this case was initiated because "Father has a perverse and unhealthy sexual attraction to young children and Mother was unwilling to protect [Child] from Father." However, Mother maintained throughout the juvenile court proceedings, and on appeal, that Father is not a threat to Child and attempts to downplay her contact with Father. Mother continues to argue that she was never told, nor was it part of the Plan, that she could not be in contact with Father. The court found this argument unpersuasive and concluded, "[T]he issue of contact with Father was both implicitly and explicitly prohibited. But more importantly, Mother should know better, she should not have to be told that contact with Father, making plans to get back with Father, and reconstruct[ing] the family after he gets out of prison is a terrible and dangerous idea for [Child]." It

found Mother was aware that she should not have contact with Father through her numerous discussions with DCFS, her family team, and the court. A DCFS caseworker testified that Mother "was aware from the beginning that her ongoing contact with Father would interfere with successful reunification." Mother also demonstrated she was aware of the restriction by repeatedly lying to DCFS and others about her contact with Father.

¶23 Ultimately, the court found sufficient evidence supporting the grounds for termination. Mother failed to appreciate the risk Father posed to Child, routinely expressed her interest in reuniting with him after he got out of prison, and consistently lied about her contact with him. The extent of Mother's contact with Father demonstrated to the court that she valued her relationship with him over establishing a support system to regain custody of Child. The court found that Mother was unable or unwilling to remedy the situation that caused Child to be placed in foster care and was unable or unwilling to remedy her parental incompetence and neglect. We conclude that ample evidence supports these findings.

## II. Best Interest of Child

¶24 Parents argue that terminating their parental rights is not in Child's best interest. We disagree. When considering terminating parental rights, a court must consider whether "termination is strictly necessary to the best interest of the child." *In re C.T.*, 2018 UT App 233, ¶ 12, 438 P.3d 100 (quotation simplified); *see also* Utah Code Ann. § 78A-6-507(1) (LexisNexis Supp. 2019). For termination to be "strictly necessary," the court must find it "absolutely essential" after examining "all of the relevant facts and circumstances surrounding the child's situation" and "whether other feasible options exist that could address the specific problems or issues facing the family." *In re C.T.*, 2018 UT App 233, ¶ 14 (quoting *In re B.T.B.*, 2018 UT App

157, ¶¶ 52–55, 436 P.3d 206, *cert. granted*, 440 P.3d 692 (Utah 2019)). But "a trial court's final decision regarding termination of parental rights should be afforded a high degree of deference," and this court will overturn a termination decision only when the result is "against the clear weight of the evidence" or leaves us "with a firm and definite conviction that a mistake has been made." *In re B.T.B.*, 2018 UT App 157, ¶ 8 (quotation simplified).

¶25    Father argues that terminating his parental rights is not in Child's best interest because his child pornography possession does not make him a danger to her. But possessing child pornography is prima facie evidence of unfitness.[5] Utah Code Ann. § 78A-6-508(7)(a) (LexisNexis Supp. 2019). Father failed to demonstrate to the court why he should be considered a fit parent and why it was not in Child's best interest to terminate his rights.[6] We conclude that the juvenile court did not err in concluding that it was in Child's best interest to terminate Father's rights.

---

5. Utah Code section 78A-6-508(7)(a) articulates that sexual abuse or exploitation is prima facie evidence of unfitness. "Sexual exploitation" is defined as, among other things, "engaging in any conduct that would constitute an offense under Section 76-5b-201, sexual exploitation of a minor, regardless of whether the individual who engages in the conduct is actually charged with, or convicted of, the offense." Utah Code Ann. § 78A-6-105(52)(c) (LexisNexis Supp. 2019). Sexual exploitation of a minor includes knowingly possessing child pornography. *Id.* § 76-5b-201(1). Father was charged with ten counts of sexual exploitation of a minor in 2017.

6. Reunification was never set as a goal for Father because he "pled guilty to several felony charges of sexual exploitation of a minor." Father does not challenge this finding on appeal.

¶26 Mother also argues that it was not in Child's best interest to terminate her parental rights. Again, the court did not err in concluding this was in Child's best interest. The court found that it was strictly necessary to terminate Mother's rights after it weighed the safety, stability, and permanency that Child received from her foster parents, who planned on adopting her, against Mother's unwillingness and inability to remedy her situation preventing her from taking care of Child. The court found that Child had bonded with her foster family and did not have a "great connection" with Mother. It also found that although "Mother ha[d] made a respectable effort to adjust her circumstances, conduct[,] and condition, she ha[d] not done so to a degree sufficient to make it in Child's best interest to return her to her care." As a result, the court found it "strictly necessary" to terminate Mother's parental rights.

¶27 The court also considered other placement options for Child, "including placement with a family member, guardianship with foster parents[,] and returning [Child] to Mother," but "no option satisfie[d] [Child's] need for safety, stability and permanency more than adoption" by her foster parents. The court found that DCFS made "reasonable efforts to provide reunification services" to Mother. Specifically, the court found that DCFS complied with the Americans with Disabilities Act and accommodated Mother's intellectual disability, helped her obtain disability insurance, gave her travel assistance for exercising parent time with Child, helped her with the peer-parenting program, and directly supervised and assisted her with parent time. The court ruled that Mother "was able to avail herself" of these services and that her "failure in this case" was not for lack of services "but a result of her dishonesty, her unwillingness to maintain boundaries for the benefit of [Child], her unwillingness to separate herself from Father, and her inability to obtain an ongoing support [system] for herself and

[Child]." We conclude the court did not err in finding that it was in Child's best interest to terminate Mother's parental rights.

CONCLUSION

¶28 The evidence was sufficient to support a finding that grounds existed to terminate Mother's parental rights. Further, the juvenile court did not err in finding that terminating Parents' parental rights was in Child's best interest. Affirmed.

_____