**2021 UT App 28**

## THE UTAH COURT OF APPEALS

STATE OF UTAH, IN THE INTEREST OF C.Z.,
A PERSON UNDER EIGHTEEN YEARS OF AGE.

M.Z.,
Appellant,
*v.*
STATE OF UTAH,
Appellee.

Opinion
No. 20200227-CA
Filed March 12, 2021

Third District Court, Salt Lake Department
The Honorable Mark W. May
No. 1156353

Colleen K. Coebergh, Attorney for Appellant

Sean D. Reyes, Carol L.C. Verdoia, and
John M. Peterson, Attorneys for Appellee

Martha Pierce, Guardian ad Litem

JUDGE DIANA HAGEN authored this Opinion, in which JUDGE
GREGORY K. ORME and SENIOR JUDGE KATE APPLEBY concurred.[1]

HAGEN, Judge:

¶1      M.Z. (the father) appeals the juvenile court's termination of his parental rights to his son, C.Z. (the child). We conclude that the State proved by clear and convincing evidence that the father had not remedied the circumstances that led to the child's

---

1. Senior Judge Kate Appleby sat by special assignment as authorized by law. *See generally* Utah R. Jud. Admin. 11-201(6).

removal and affirm the juvenile court's termination of the father's parental rights.

BACKGROUND

¶2     The child was born in May 2017.[2] In December 2017, C.Z.'s mother (the mother) was charged with aggravated assault and domestic violence in the presence of a child for stabbing the father in the chest in front of the child. At the time, the mother was already under juvenile court jurisdiction for criminal trespass and habitual truancy. The juvenile court issued a no-contact order between the mother and the father and ordered that the child be assessed as "at risk of removal" from the mother's care.

¶3     Throughout January and February 2018, the Division of Child and Family Services (DCFS) "worked with the family in devising a safety plan for the child to remain" in the home with the mother. DCFS reported that the mother had several "thinking errors," including her beliefs that she did not need to abide by the no-contact order, did not need therapy, and that there was no harm in smoking marijuana while breastfeeding the child. DCFS also reported that the father and mother had smoked marijuana in the presence of the child on multiple occasions, including one instance where the father was caught smoking in the mother's family's house, resulting in the family's eviction. At the end of February, the mother was ordered "to be held in the Salt Lake Valley Detention Center" for a brief period.

¶4     In March 2018, DCFS again attempted to meet with the mother to establish a safety plan so the child could remain in her custody. The mother missed the meeting, and DCFS received a

---

2. The mother and the father were not married at the time of the birth, but the father's paternity was undisputed and officially established prior to the dependency adjudication in March 2018.

report that she had been smoking marijuana and had violated the no-contact order by spending the weekend with the father. As a result, the State filed a motion for the child's expedited placement in temporary custody. At the shelter hearing, the juvenile court granted the motion, placing the child in the temporary custody of DCFS. At a follow-up hearing later that month, the court made official findings. In relation to the mother, the court found the child was "neglected" under Utah Code subsection 78A-6-105(41). In relation to the father, the court found the child was "[d]ependent" under Utah Code subsection 78A-6-105(14), meaning that the child was deemed "homeless or without proper care through no fault of the child's parent, guardian, or custodian."

¶5 Two months later, in May of 2018, the court held a disposition hearing to establish permanency goals for the child pursuant to Utah Code section 78A-6-312. The court determined that the child's primary permanency goal would be "first and foremost reunification" with the parents and "the concurrent plan" would be "adoption." The court ordered DCFS to "provide reunification services to the parents consistent with the services identified in the service plan." The court ordered all parties to follow the service plan, which included a requirement that the parents complete domestic violence assessments. After father's counsel raised concerns that the father would "get assessed as a perpetrator rather than a victim," the court ordered that the plan be "amended to have the father participate in a [domestic violence] class as a victim."

¶6 At the first child welfare review hearing in July 2018, the court authorized unsupervised visits for the father, but not for the mother, whose parent-time continued to be supervised. The caseworker noted that the parents still seemed to be spending time together and suggested couples therapy if they hoped to co-parent someday. The court lifted the no-contact order but warned the parents that it was for the purpose of domestic violence therapy only and "that doesn't mean you drop by any

time you want." At the next child welfare review hearing, in September 2018, the court found that both parents were "doing really well" and "marching toward reunification."

¶7 The steady progress did not continue, however. At the third child welfare review in December 2018, the court found that the mother was smoking marijuana again, the father was not following through with his therapy and, most alarming, there had been another domestic violence incident in the presence of the child on Thanksgiving Day. The parents, apparently living together again, fought about the child's nap, and the mother hit the father in the face. He responded by pushing her away by the throat. She grabbed him by the hair and tried to prevent him from leaving. Once he got away, the father ran to a nearby school, where the responding police officer found him with a bloody nose and no shoes. The officer cited the mother as "the predominant aggressor" but allowed the father to remain in the home because, the officer later testified, the father "basically wanted to go back because he said his child was a ward of the State, that this was the only time they got to spend time with him." The juvenile court warned both parents this was "a step back" and warned the father in particular about the domestic violence, saying, "You have to go to therapy. . . . [Y]ou've got to do all these things" and there is "not a lot of time left." The court informed both parents that, if it was not safe for the child to return home by the time of the final permanency hearing, the court would have no choice but to "terminate services" toward reunification and instead move toward adoption, and "[n]obody wants to go down that road."

¶8 The final child welfare review hearing was sixty days later, in February 2019. Report of the parents' progress was still mixed. The State expressed ongoing concerns about the father's ability to "hold boundaries with Mom and keep kiddo safe." The DCFS caseworker also reported that the father's attendance at therapy had not been consistent, although father's counsel complained that the father still had not received enough of the

type of specialized domestic violence therapy he needed as a victim. The court informed the parents that if the permanency hearing were that day, it could not return the child to them. The court warned the father, in particular, that if reunification of the child with the mother was not going to be possible, the father had better start giving "full effort" and decide, "Is this what you want?"

¶9 At the permanency hearing on March 19, 2019, the court found that "return to the home would be contrary to the welfare of the child at [that] time." But, the court did find, by a preponderance of the evidence that there had been substantial compliance, reunification was probable within ninety days, and an extension would be in the best interest of the child. The court warned the parents that the report in ninety days had "better be a great report."

¶10 At the continued permanency hearing on May 30, 2019, the DCFS caseworker reported that the father "had been fully engaged" and wanted reunification to continue, but the mother had "reached the point that she believe[d] that she's not in the child's best interest" and was ready to relinquish her parental rights voluntarily. The caseworker also expressed concern that the parents were apparently living together even though the father reported moving out of the mother's residence several months earlier. The guardian ad litem reported that she did not feel it was safe to return the child to either parent that day. She had particular concern about the father's "relationship with the mother." The court gave the father one more extension, but with the following warning:

> [T]here's continued domestic violence . . . . [E]ven if [the father] is the victim, he was stabbed the first time and he went back into that relationship with his child, and then there's been another domestic violence incident, and they're still together . . . . He

is supposed to be in treatment, and he hasn't gone
. . . .

. . . .

Dad, you have to get in treatment. I mean that's the bottom line. I don't need any more excuses. You have to be in treatment. You keep going back to a toxic relationship, and if you're going to do that, then whatever her baggage is is your baggage. That's the way the law works.

¶11   At that final permanency hearing in August 2019, the court found that returning the child to the father would create a substantial risk of detriment to the child's physical or emotional well-being. The court explained, "[T]he law is pretty firm and . . . at this point I can't give another extension, and it's not safe today to send the child home. So under the law, . . . I have to terminate reunification services, I have to change the goal to adoption."

¶12   The State filed a petition for termination of parental rights, and the court set the matter for trial. In the interim, the mother voluntarily relinquished her parental rights.

¶13   At trial in January 2020, the State presented evidence of the father's continued unhealthy relationship with the mother. The father's therapist, provided by DCFS, testified that the father had "symptoms of post-traumatic stress disorder" as a result of "having been attacked by" the mother. Nevertheless, the father testified that the mother had accompanied him on the last few visits with the child, after she voluntarily relinquished her parental rights. The foster parent, who dropped off the child for visits with the father, testified that the mother was with the father at every visit in December and January. When the State asked the father why the mother went along, he answered twice that the mother "wanted to see" the child and the father had never gotten a clear answer from the case worker as to whether

that was allowed. The child's guardian ad litem asked the court to expressly order that the mother was not allowed to attend visits with the child.

¶14 In February 2020, the juvenile court entered an order terminating the father's parental rights. Applying a clear-and-convincing-evidence standard, the court made extensive factual findings and concluded that those findings supported four statutory grounds for termination: (1) that the father had been "an unfit or incompetent parent of his child"; (2) that the child had "been cared for in an out-of-home placement under the supervision" of DCFS, the father had "substantially neglected, willfully refused, or ha[d] been unable or unwilling to remedy the circumstances that cause[d] the child to be in an out-of-home placement," and "there [was] a substantial likelihood that the parent [would] not be capable of exercising proper and effective parental care in the near future"; (3) that there had been a failure of parental adjustment; and (4) that the father had made "only token efforts to provide support" for the child. *See* Utah Code Ann. § 78A-6-507(1)(c)–(f) (LexisNexis Supp. 2020). The court concluded that, "based on the totality of the evidence, it [was] in [the child's] best interest to be adopted by the foster parents" and that it was "strictly necessary to terminate the father's parental rights to permit that adoption."

## ISSUE AND STANDARD OF REVIEW

¶15 The father contends that the juvenile court erred in terminating his parental rights. "Whether a parent's rights should be terminated presents a mixed question of law and fact." *In re B.R.*, 2007 UT 82, ¶ 12, 171 P.3d 435. "The ultimate conclusion that a parent is unfit or that other grounds for termination have been established is a legal question." *In re L.M.*, 2019 UT App 174, ¶ 5, 453 P.3d 651 (per curiam) (cleaned up). But because "such decisions rely heavily on the juvenile court's assessment and weighing of the facts in any given case," that "decision should be afforded a high degree of deference." *Id.*

(cleaned up). Thus, we will overturn the juvenile court's decision only when that decision is "against the clear weight of the evidence." *Id.* (cleaned up). A decision is against the clear weight of the evidence when the court "either failed to consider all of the facts or considered all of the facts and its decision was nonetheless against the clear weight of the evidence." *See In re B.R.*, 2007 UT 82, ¶ 12. Indeed, "an appellate court must be capable of discriminating between discomfort over a trial court's findings of fact—which it must tolerate—and those that require a court's intercession. It must forebear disturbing the 'close call.'" *In re Z.D.*, 2006 UT 54, ¶ 33, 147 P.3d 401 (cleaned up).

## ANALYSIS

¶16    Utah law recognizes that "the right of a fit, competent parent to raise the parent's child without undue government interference is a fundamental liberty interest . . . and is a fundamental public policy of this state." *In re Adoption of K.A.S.*, 2016 UT 55, ¶ 25, 390 P.3d 278 (cleaned up); *see also* Utah Code Ann. § 62A-4a-201(1)(c) (LexisNexis Supp. 2020).[3] Indeed, there is a "strong . . . presumption that it is in a child's best interests to be in the custody of his or her natural parent." *In re J.M.V.*, 958 P.2d 943, 947 (Utah Ct. App. 1998). But, "parental rights are not absolute. A parent's rights must be balanced against the state's important interest in protecting children from harm." *In re J.A.*, 2018 UT App 29, ¶ 44, 424 P.3d 913 (cleaned up).

¶17    In this case, the child was adjudicated dependent as to the father in March 2018, shortly after the initial shelter hearing that placed the child in DCFS custody. Utah Code Ann. § 78A-6-105(14) (LexisNexis Supp. 2020). A determination of dependency rebuts "the *presumption* that the child is best served by being in the parent's custody." *In re J.M.V.*, 958 P.2d at 948. But even

---

3. Where, as here, amendments to a statute do not affect the issues in this case, we refer to the current version of the statute.

though the parental presumption does not apply, the petitioner—in this case, the State—always has the burden to "establish the facts" justifying termination by "clear and convincing evidence." *See* Utah Code Ann. § 78A-6-506(3) (LexisNexis 2018).

¶18 "To terminate parental rights, a juvenile court must make two separate findings." *In re C.T.*, 2018 UT App 233, ¶ 12, 438 P.3d 100 (cleaned up). First, the "court must find by clear and convincing evidence that there is at least one statutory ground for termination." *Id.* (cleaned up). Second, "the court must assess what is in the child's best interest" and determine "whether termination is strictly necessary to promote the child's welfare and best interest." *In re B.T.B.*, 2020 UT 60, ¶ 76, 472 P.3d 827.

¶19 The father's arguments on appeal are limited to challenging the first step in the juvenile court's analysis—whether a statutory ground for termination was established by clear and convincing evidence. Where the juvenile court finds multiple grounds for termination, "we will affirm when we are able to sustain one of the grounds and need not consider the other grounds relied on by the court." *In re D.M.*, 2020 UT App 59, ¶ 10, 462 P.3d 1278; *see also* Utah Code Ann. § 78A-6-507(1) (LexisNexis Supp. 2020) (stating that "the court may terminate all parental rights with respect to the parent if the court finds any one" statutory ground).

¶20 We focus our analysis on the juvenile court's conclusion that termination of parental rights was justified because the father failed to remedy the circumstances causing the child's removal under Utah Code subsection 78A-6-507(1)(d) (Supp. 2020).[4] To terminate parental rights on this ground, the court must find,

---

4. Because we do not address unfitness as an alternative ground for termination, we have no need to reach the father's argument

(continued…)

    (i) that the child is being cared for in an out-of-home placement under the supervision of the court or the division;

    (ii) that the parent has substantially neglected, willfully refused, or has been unable or unwilling to remedy the circumstances that cause the child to be in an out-of-home placement; and

    (iii) that there is a substantial likelihood that the parent will not be capable of exercising proper and effective parental care in the near future.

Utah Code Ann. § 78A-6-507(1)(d).

¶21    In this case, the child was in an out-of-home placement under the supervision of the court and DCFS. The "circumstances" that had caused the child to be placed in foster care included the child's dependency status and the child's exposure to domestic violence. The evidence supports the juvenile court's finding that the father failed to remedy either of those circumstances.[5]

---

(…continued)

that the juvenile court "improperly deferred to the caseworker regarding the ultimate issue of unfitness."

5. In applying this provision, the juvenile court did not improperly shift the burden to the father to demonstrate his fitness as a parent. Although the parent has a responsibility to remedy the circumstances that led to removal, Utah Code Ann. § 78A-6-507(1)(d), the State has the burden of proving by clear and convincing evidence that the parent failed to do so, *id.* § 78A-6-506(3). The court properly applied that burden in this case.

¶22 First, the father was unable to remedy the circumstances that led to the removal of the child based on the dependency adjudication. To remedy those circumstances, the father needed to ensure that he could provide a home and proper care for the child. *See id.* §§ 78A-6-105(14), -507(1)(d).

¶23 Although the father made progress at maintaining employment and ending his drug use, he bounced back and forth between living with the mother and staying at his father's house where the conditions were unsuitable for a child. Even if the father assumed until late in the child welfare proceedings that the mother would provide the primary home for the child, the court warned him to be prepared to step up when it appeared doubtful that the child would be reunited with the mother. The court found that the father, having gone through the two previous permanency hearings, was aware that by the final permanency hearing "changes in his life had to be in place" so "that it was safe for [the child] to return to him that day."

¶24 Despite having eighteen months to achieve such stability, the father did not have appropriate housing or a plan for childcare until three days before the final permanency hearing. Given the father's track record, the juvenile court was skeptical about the stability of these last-minute living and childcare arrangements. "The weight which a juvenile court must give any present ability evidence is necessarily dependent on the amount of time during which the parent displayed an unwillingness or inability to improve his or her conduct." *In re B.R.*, 2007 UT 82, ¶ 13, 171 P.3d 435 (cleaned up). Therefore, "if a parent has demonstrated some improvement in parenting ability but not a strong likelihood that the parent can provide a proper home for the child in the very near future," we cannot "overturn a court's order terminating parental rights." *Id.* (cleaned up). After eighteen months of services, the father had not progressed to even a single overnight visit with the child and had exhausted all possible extensions of time. The court reasonably concluded that the father's efforts were "far too little far too late."

¶25 Perhaps more importantly, the father failed to protect the child from exposure to domestic violence by the mother. The mother's serious assault on the father in the presence of the child was one of the circumstances that led to the child's removal. Despite a no-contact order, the father continued spending time with the mother, and there was another incident of domestic violence in the presence of the child on Thanksgiving Day. Even after the juvenile court terminated the mother's parental rights, the father continued bringing her to visits with the child, placing the child in an unsafe environment.

¶26 That evidence supported the court's finding that the father "and the mother still have an ongoing relationship" and that the father "would likely allow the mother to parent" the child. The court found that "the mother is an unfit parent" and that allowing her to parent was "of serious concern because: (a) the mother stopped participating in services; (b) the mother was the aggressor in the domestic violence incidents; (c) she had positive drug tests on the rare occasions when she chose to test; and (d) the mother voluntarily relinquished her parental rights." The father's choice to remain involved with the mother—whether romantically or as a co-parent—placed the child at continued risk.

¶27 The father points to evidence that he received mixed messages from the caseworker about his relationship with the mother and whether she was permitted to join him for visits with the child. But the juvenile court was "in the best position to weigh [this] conflicting testimony, to assess credibility, and from such determinations, render findings of fact." *See In re J.H.*, 2012 UT App 195, ¶ 2, 283 P.3d 971 (per curiam). We will not overturn the juvenile court's determinations unless they are against the clear weight of the evidence. *See In re Z.D.*, 2006 UT 54, ¶ 33, 147 P.3d 401. The existence of the no-contact order, as well as the court's admonitions to the father, support the conclusion that the father had "chosen to remain with the mother" despite the danger posed to the child.

¶28 The father also argues that the juvenile court "abused its discretion in not properly evaluating [him] as a domestic violence survivor." Specifically, the father suggests that the court employed something of a double standard and analyzed his "reactions to domestic violence perpetrated upon him differently than a female victim." We disagree. The juvenile court ordered that the father be provided treatment as a victim and faulted the mother for the domestic violence.

¶29 We recognize that "extricating oneself from an abusive relationship can pose an extremely difficult hurdle for victims of domestic abuse," regardless of gender. *See In re L.M.*, 2019 UT App 174, ¶ 8, 453 P.3d 651 (per curiam). Nevertheless, we have consistently held that a juvenile court faced with a victim parent who does not leave the abusive relationship "may find that the parent has failed to remedy the circumstances that led to a child's removal." *Id.* For example, in *In re T.M.*, we affirmed the termination of a father's parental rights in part because he had "effectively prioritized his relationship with" his abusive spouse over the protection of his children. 2006 UT App 435, ¶ 9, 147 P.3d 529. In that case, the juvenile court found that "although [the father] completed most of the treatment plan—albeit a significant portion only in the eleventh hour, . . . he [had] been unable to quit his self-described 'addiction' to [the mother], and his unwillingness to give up his ongoing relationship with [the mother] . . . endanger[ed] the [c]hildren." *Id.* ¶ 9. We agreed, stressing that the father's "present and ongoing failure to detach himself from this relationship and protect the [c]hildren from exposure to [the mother was] especially significant to the court's finding of unfitness." *Id.* ¶ 19. This court has reached the same conclusion in numerous cases where the mother was the victim of domestic violence. *See, e.g., In re L.M.*, 2019 UT App 174, ¶¶ 3, 6–7, 11 (holding that "the evidence was sufficient to support the juvenile court's determination that [the mother] had failed to remedy the circumstances leading to [the child's] removal" where mother did not show up to domestic violence victim therapy appointments, "had not internalized the lessons from

the domestic violence therapy," and brought [the father] to visits after his parental rights had been terminated); *In re F.M.*, 2002 UT App 340, ¶¶ 3, 7–8, 57 P.3d 1130 (affirming termination of mother's parental rights where evidence showed she had co-dependent relationship with abusive father, had talked about leaving father long enough to regain custody of the children and then going back to him, and then had contact with him just two weeks before the termination trial); *In re G.B.*, 2002 UT App 270, ¶ 17, 53 P.3d 963 (affirming termination of mother's parental rights where mother claimed she had complied with the service plan, but juvenile court found that she continued to reside in a home with the abusive father, and had no intention of separating from him); *In re G.D.*, 894 P.2d 1278, 1280 (Utah Ct. App. 1995) (affirming termination of mother's parental rights in part because she "failed to sever all relationships with the father within a reasonable time" and failed to "eliminate the risk of continued abuse").

¶30    In these cases, juvenile courts are not "unnecessarily drawing negative inferences from a [victim's] decision to maintain a relationship with the batterer." *In re C.C.W.*, 2019 UT App 34, ¶ 19 n.4, 440 P.3d 749. Rather, they are focusing on the well-being of the child, whose safety is of primary importance, by assessing whether the parent's ongoing refusal to sever the relationship poses a continuing threat to the child. Domestic violence has a negative effect on a child even if the child is not the direct recipient of or witness to the violence. *See id.* ¶ 20, (recognizing that children in these situations learn lessons such as "that the violence toward a loved one is acceptable" and that "coercive power and violence" are "a way to influence loved ones[,]" and noting that such children "fail to grasp the full range of negative consequences for the violent behavior" (cleaned up)). "Utah case law indicates that courts have minimal empathy for parents whose strong emotional ties to their spouses or significant others jeopardize their children's safety." *In re T.M.*, 2006 UT App 435, ¶ 20. Here, the juvenile court's conclusion that the father had not remedied the circumstances

that led to removal was supported by clear and convincing evidence that he was unable or unwilling to extricate himself from a relationship with the mother that was toxic and that posed an ongoing threat to the child.

¶31 In concluding that the father failed to remedy the circumstances that led to the child's removal and would not be capable of exercising proper and effective parental care in the near future, the juvenile court noted that it "truly struggled with this decision." It "extended reunification services twice, admittedly based on sympathy for [the father's] circumstances as opposed to strict compliance with the statutes governing extension of services." But permanency adjudication occurs on a strict timeline because the passage of time seriously affects the child waiting in "legal limbo." *See In re S.L.*, 1999 UT App 390, ¶ 42, 995 P.2d 17 (explaining that the "overarching purpose" of our child welfare laws "is to provide stability and permanency for abused and neglected children, and to end the 'legal limbo' of state custody as quickly as possible" (cleaned up)). And, as the juvenile court found, "[t]he length of time that [the child] has been out of the home relative to his age and the length of time that it took [the father] to . . . become stable had a significant destructive effect on their parent/child relationship." Viewing the record as a whole, the juvenile court's finding that the father had not remedied the circumstances that had created the out-of-home placement was not against the clear weight of the evidence.

CONCLUSION

¶32 We conclude that there was sufficient evidence to support the juvenile court's finding under Utah Code subsection 78A-6-507(1)(d) that the father had failed to remedy the circumstances that caused the child's out-of-home placement. This is true as to both the child's dependency status and the risk of exposure to domestic violence. Accordingly, we affirm the juvenile court's termination of the father's parental rights.

———————